**J. Larry BRADSHAW, Plaintiff–
Counterclaim Defendant–
Appellee,**

v.

**UNITED STATES of America,
Defendant–Counterclaimant–
Appellant.**

Nos. 94–4018, 94–4064.

United States Court of Appeals,
Tenth Circuit.

Dec. 4, 1995.

Order Denying Rehearing
April 18, 1996.

J. Jay Bullock, Salt Lake City, Utah, for Plaintiff–Counterclaim Defendant–Appellee.

Bruce R. Ellisen, Attorney, Tax Division, Department of Justice, Washington, D.C. (Loretta C. Argrett, Assistant Attorney General, and Jonathan A. Wasserman, Attorney, Department of Justice, Washington, D.C., and Scott M. Matheson, United States Attorney, Salt Lake City, Utah, with him on the brief), for Defendant–Counterclaimant–Appellant.

Before TACHA and HOLLOWAY, Circuit Judges, and ELLISON,* District Judge.

HOLLOWAY, Circuit Judge.

The government as Defendant–Appellant appeals from a judgment of the district court awarding Plaintiff–Appellee J. Larry Bradshaw a judgment against the United States with respect to a penalty assessment against plaintiff under 26 U.S.C. § 6672 for failure to pay over withholding taxes. Jurisdiction in this court is proper under 28 U.S.C. § 1291.[1]

---

* The Honorable James O. Ellison, Senior United States District Judge for the Northern District of Oklahoma, sitting by designation.

1. On March 9, 1994, we entered an order directing the parties to file supplemental briefs addressing whether we have jurisdiction "where the notice of appeal was filed while a timely served motion to amend was pending before the district court." We have reviewed the record and the supplemental submissions and agree with the parties that the government complied with the requirements of Fed.R.App.P. 4(a). Thus there is no jurisdictional defect, and we will consider the merits of both No. 94–4018 and No.

## I

Plaintiff–Appellee J. Larry Bradshaw was president of Heritage Building Products (HBP) during the last quarter of 1985 and the first three quarters of 1986. I App. at 69. HBP was wholly owned by Heritage Corporation. Bradshaw was president of Heritage Corporation and owned 13% of its stock. Bradshaw was also on the board of directors of both corporations. *Id.* at 66, 69; II App. 152.

HBP had a line of credit from Zions First National Bank (the Bank). I App. 69–71. On May 10, 1985, Bradshaw, on behalf of HBP, entered into a new credit arrangement with the Bank (the Agreement), whereby the Bank established for HBP a revolving line of credit in the amount of $650,000. *Id.* at 69–71; II App. 239–61. As part of the Agreement, HBP granted the Bank liens on all of HBP's assets and the right to freeze any of HBP's accounts with the Bank in the event of a default. II App. 254–55.

On March 15, 1986, the Bank determined that HBP had defaulted and therefore, pursuant to the Agreement, froze all of HBP's accounts. I App. at 80–84. Thereafter, any funds received by HBP were deposited into a "control account." HBP could not transfer funds from this account to its operating account without the Bank's approval.

Beginning on May 29, 1986, the Bank allowed HBP to disburse funds from its operating account; however, the Bank's approval was required for each disbursement. *Id.* at 101–02. The Bank would not honor checks that were not pre-approved by it. *Id.* The Bank approved some payments, such as payment of an insurance premium, payments to Bradshaw for services rendered, and payment of net wages to employees,[2] but repeatedly refused to approve payment of federal and state withholding taxes, despite Bradshaw's requests that those payments be authorized. *Id.* at 89–90, 101–02, 114–16; II App. at 149. Bradshaw, on behalf of HBP,

signed the checks for the payments the Bank approved. *See* II App. at 267–71.

In early 1986, prior to the freeze, Bradshaw personally lent HBP $40,000. *Id.* at 283–84. These funds were used to pay $15,-000 in payroll and to pay $25,000 of interest to the Bank. *Id.* After the freeze, Bradshaw again lent $40,000 to HBP, which was used to pay $25,000 in interest to the Bank and $15,000 to suppliers. *Id.*

HBP failed to pay its federal withholding taxes to the IRS in the first three quarters of 1986 and a penalty for the late payment of taxes for the fourth quarter of 1985. In August 1986 Bradshaw, on behalf of HBP, entered into an agreement for voluntary liquidation and HBP ceased doing business in September 1986. Supp.App. at 75–106; I App. at 65.

Pursuant to 26 U.S.C. § 6672 the IRS assessed a 100% penalty ($75,601.01) against Bradshaw as a responsible person who willfully failed to collect or truthfully account for and pay over to the United States federal withholding taxes for the first three quarters of 1986 and for failure to pay the penalty for the late payment of the fourth quarter 1985 taxes.

Bradshaw brought a refund suit seeking the return of $438.60 he had paid as a partial payment of the penalty. The government counterclaimed for the balance of the assessment. After a bench trial, the district court found in favor of Bradshaw, concluding that Bradshaw was not a "responsible person" within the meaning of § 6672 because he had no power to disburse any of HBP's funds without the Bank's approval. The judge also concluded that because of the Bank's "complete control of the company's accounts and assets," Bradshaw's failure to pay the taxes was not willful. The court entered an amended judgment for Bradshaw in the amount of $34,578.54, and the government appealed.[3]

---

94–4064, which present the same issues on this single controversy.

**2.** HBP employees' wages were paid from a payroll account at another bank, First Interstate. The Bank approved the transfer of funds to this payroll account. However, the Bank did not control the amounts held in the payroll account. II App. at 177–78.

**3.** The judgment greatly exceeded the amount which Bradshaw had originally sought for two reasons. First, Bradshaw had made additional partial payments of the penalty at issue here

## II

Under 26 U.S.C. § 6672(a) (1988):

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over....

 "When a corporate employer neglects to pay the required [federal withholding] taxes, section 6672(a) authorizes the Government to assess the full amount of taxes due against the corporation's responsible officers in the form of a penalty." *Howard v. United States*, 711 F.2d 729, 733 (5th Cir.1983). This penalty is distinct from and in addition to the employer's liability for these taxes. *Id.* "The § 6672 penalty may be assessed against (1) any responsible person (2) who has willfully failed to collect, account for, or pay over federal employment taxes." *Muck v. United States*, 3 F.3d 1378, 1380 (10th Cir.1993). Arguing for reversal, the government says that Bradshaw was a responsible person who willfully failed to collect, account for, or pay over the withholding taxes, and that the district court's conclusions to the contrary were in error.

### A. Responsible Person

#### 1. *Standard of Review*

The government argues that the ultimate determination that Bradshaw was not a responsible person is a question of law subject

to *de novo* review. Appellant's Opening Brief at 12. Bradshaw, on the other hand, argues it is a question of fact subject to the clearly erroneous standard of review. Appellee's Brief at 13–14.

We have recently resolved this question. In *Taylor v. Internal Revenue Service*, 69 F.3d 411, 415 (10th Cir.1995), we held that the ultimate determination whether an individual is a "responsible person" within the meaning of 26 U.S.C. § 6672 involves an application of law to fact which is subject to *de novo* review on appeal. This holding agreed with the views of the Second and Eleventh Circuits. *See United States v. McCombs*, 30 F.3d 310, 319 (2d Cir.1994); *Hochstein v. United States*, 900 F.2d 543, 547 (2d Cir.1990); *Thibodeau v. United States*, 828 F.2d 1499, 1503 (11th Cir.1987). We disagreed with other circuits.[4]

#### 2. *Was Bradshaw a Responsible Person?*

 Courts have generally given a broad interpretation to the term "responsible person" under § 6672. *Denbo v. United States*, 988 F.2d 1029, 1032 (10th Cir.1993). "A person is responsible within the meaning of the statute if that person is required to collect, truthfully account for or pay over any taxes withheld from the wages of a company's employees." *Id.* A responsible person generally is, but need not be, a managing officer or employee, and there may be more than one responsible person. *Id.; Muck v. United States*, 3 F.3d at 1380–81. "Indicia of responsibility include the holding of corporate office, control over financial affairs, the authority to disburse corporate funds, stock ownership, and the ability to hire and fire

---

during the pendency of the suit. Thus, at the time of judgment, his partial payments totaled $27,764.54. I App. at 49. In addition, the parties agreed that Bradshaw had overpaid his 1991 taxes in the amount of $6,814. *Id.* Although the government maintained that Bradshaw could not recover this latter amount in this action because it was not related to the liabilities at issue, the district court included that amount in its judgment. The government has raised no issue or objection addressing that portion of the judgment, which thus is unaffected by our disposition. Our conclusions in Part III, *infra*, deal with these amounts which, as explained, were included in the district court's judgment.

4. The First, Fifth, Sixth, Seventh, and Ninth Circuits treat the issue of responsibility under § 6672 as a question of fact and apply the clearly erroneous standard of review. *Caterino v. United States*, 794 F.2d 1, 3 (1st Cir.1986), *cert. denied*, 480 U.S. 905, 107 S.Ct. 1347, 94 L.Ed.2d 518 (1987); *Raba v. United States*, 977 F.2d 941, 943 (5th Cir.1992); *Sinder v. United States*, 655 F.2d 729, 731 (6th Cir.1981); *United States Internal Revenue Serv. v. Charlton*, 2 F.3d 237, 240 (7th Cir.1993); *Alsheskie v. United States*, 31 F.3d 837, 839 (9th Cir.1994).

employees." *Denbo,* 988 F.2d at 1032. "Among other things, therefore, a corporate officer or employee is responsible if he or she has significant, though not necessarily exclusive, authority in the 'general management and fiscal decisionmaking of the corporation.'" *Id.* (citation omitted).

■ Bradshaw was the president of HBP during the last quarter of 1985 and the first three quarters of 1986. He was president of Heritage Corporation (the sole shareholder of HBP) and owned 13% of the Heritage Corporation stock. Bradshaw was also on the board of directors of both corporations. He was an authorized signatory on HBP's

accounts and had the authority to hire and fire its employees. Based on these facts, we feel that Bradshaw had the necessary indicia of responsibility to satisfy the requirements of § 6672 to be held a "responsible person."

However, our inquiry is complicated by the fact that at the time the taxes became delinquent, Bradshaw lacked the power to disburse funds from HBP's accounts, absent the Bank's approval. Bradshaw argues that because he lacked this power he was not a "responsible person" under the statute. In this connection the district court made detailed findings on the Bank's exertion of financial control of HBP's assets.[5] On the

5. The trial judge found:

9. Between May 10, 1985, and March 14, 1986, Heritage Building Products was in control of all of the company's financial assets, including loan proceeds disbursed by Zions Bank and the operating account. During this period of time it paid all payroll taxes as they accrued and became due for the second and third quarters of 1985.

10. In late 1985 and early 1986, Heritage Building Products experienced increasing financial difficulties, and on or about January 28, 1986, the company's comptroller informed Zions that the company had not paid its federal withholding taxes for the fourth quarter of 1985, which would be due on January 31, 1986, and that it did not have enough money to pay that obligation. Heritage and Zions began negotiations for a further loan, which negotiations continued until a further extension of funds was obtained on or about April 8, 1986.

11. Pursuant to the Inventory and Accounts Receivable Security Agreement of May 10, 1985, Zions Bank froze all of Heritage Building Products' accounts on March 15, 1986, with no previous Notice to the company. After this, the bank did not allow any fund withdrawals by Heritage from any account including the Heritage operating account, until May 29, 1986. Zions had and maintained full control over disbursal of all monies from the Heritage accounts.

12. On or about April 8, 1985, Heritage Building Products borrowed $150,000 from Zions Bank to meet its withholding tax obligation for the fourth quarter of 1985 and other outstanding debts. The Internal Revenue Service was paid withholding tax and interest of $40,963.37 that was due for the fourth quarter of 1985. A late payment penalty of $2,224.75 had been assessed, but the payment of $40,-963.37 was made after discussion with the Internal Revenue Service in which plaintiff understood that the Internal Revenue Service would waive the penalty because taxes and

interest were being paid. *A few months later, the company was notified that the penalty had been reinstated, but Zions Bank then controlled all company funds and refused to pay the penalty or any other withholding taxes.*

13. On May 29, 1986, Zions Bank again allowed Heritage Building Products to have limited access to funds in its operating funds. All Heritage deposits were placed into the Zions First National Bank Assignee Account which was under Zions' absolute control, as was the case since May of 1985. However, as to funds transferred from that account to the Heritage Operating Account, the Bank's approval was now required prior to any disbursement from the said operating account and relative to each and every expenditure therefrom. *Accordingly, before the 1986 first quarter federal withholding taxes were due on April 30, 1986, complete financial control of the company's assets had been assumed by Zions Bank.*

14. From on and after March 15, 1986, employees of Heritage Building Products could only write checks on the operating account disbursing company funds after gaining prior authorization from Zions Bank; checks that were not pre-approved by the bank were "bounced," because Zions Bank would not honor those checks.

15. From on and after March 15, 1986, for approximately six months until September 1986, Zions Bank approved payment of net wages to Heritage Building Products' employees, *but would not release funds for payment of taxes withheld for federal and state income taxes.*

16. On August 6, 1986, Heritage and Zions entered into an agreement denominated as "Agreement for Voluntary Liquidation," in which it was contemplated that Heritage would be permitted to pay all "lawfully imposed taxes" from the proceeds of the disposition of the Heritage properties. Full credit against existing indebtedness from Heritage to Zions was to be given only after payment of such taxes and assessments. It was specifical-

foundation of the findings noted in the margin and others, the district judge concluded that Bradshaw had no authority to disburse HBP's funds in order to pay the withholding taxes and thus was not a "responsible person" under § 6672. We must determine whether, in his conclusions, the judge's application of the law to the facts was correct.

Bradshaw contends that the power of decision on which creditors to pay was "wrenched" without notice from officers at HBP and thereafter exercised by the Bank. Brief for the Appellee at 10, 22. The government argues that "it is clear that [the Bank's] authority [over HBP's finances] was voluntarily granted by [Bradshaw] as president of HBP when ... he ceded authority to the Bank to prevent the disbursement of funds from HBP's accounts without the Bank's approval...." Appellant's Opening Brief at 19. The government asserts that this voluntary cession of financial authority cannot absolve Bradshaw of his responsibility under § 6672. *Id.* at 23. We agree.

In *Kalb v. United States*, 505 F.2d 506 (2d Cir.1974), *cert. denied*, 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975), the plaintiff company had entered into a financing arrangement similar to the one between HBP and the Bank. Under the arrangement in *Kalb*, the bank continued to finance the company but oversaw the company's financial operations. Like Bradshaw, the appellants in *Kalb* argued that they were not responsible persons because the bank controlled their company's finances. The Second Circuit rejected that argument:

> *Appellants concede that any power the bank may have had to select which creditors should be paid was granted by appellants as part of the consideration for the bank's continuing financing.* ... Appellants maintained legal control of the company, including the power to sign checks. Appellants were always free to rescind the agreement if it involved them in breaches of their duties under section 3402(a).

*Id.* at 510 (emphasis added). *Kalb* rests on the premise that a corporate officer may not escape liability as a "responsible person" under § 6672 by voluntarily entering into agreements which permit preferring other creditors to the government. *Id.* at 510. We are persuaded that this reasoning in *Kalb* should apply here.

By giving the Bank the power to exercise financial control of HBP in the event of a default, Bradshaw necessarily gave the Bank the power to decide whether or not to pay a given creditor. In this way Bradshaw effectively granted the Bank the power, in the case of HBP's default, to prefer other creditors over the government. While we agree with the district judge that when the Bank froze HBP's accounts Bradshaw lacked the

ly contemplated that individual Heritage borrowers including plaintiff would have no personal liability for such taxes.

....

18. Payment of taxes was requested by Heritage Building Products on April 24, 1986, and on each month-end report submitted to Zions Bank thereafter. *Plaintiff five times personally requested that Zions Bank pay or authorize payment of federal withholding taxes owed by Heritage Building Products, and was told by an employee of Zions Bank that the bank would not authorize Heritage to pay taxes from any of the funds in the operating account or from any funds or monies under the control of Zions. Zions consistently refused to release funds to pay such taxes, and the bank always refused to release funds for payment of any tax obligation.*

....

20. After March 15, 1986, no employee of Heritage Building Products, including plaintiff, had any authority or ability to allocate funds and make disbursements for payment of federal and state income taxes withheld from employees' wages, because Zions Bank at all times thereafter controlled all of Heritage's assets.

....

23. Plaintiff advanced an additional $40,-000 to Heritage as aforesaid after the freezing of accounts and assets by Zions. These funds were advanced in the contemplation that taxes would be paid from proceeds of operations of the business under an agreement which was being negotiated and which was later consummated and fully executed on August 6, 1986.

24. *Plaintiff did not wilfully fail to refuse to make payment of taxes for the last quarter of 1985 or the three quarters of 1986. As to the three quarters of 1986 which are in question plaintiff was not a responsible person because he had no sufficient or actual control over the funds and assets of Heritage.*

I App. at 33–40 (emphasis added). The judge also entered corresponding conclusions of law that Bradshaw was not a "responsible person" under the statute and that he had not wilfully failed to pay the withholding taxes.

power to pay the taxes absent the Bank's approval, this lack of power was the direct result of the Agreement which Bradshaw had negotiated and entered into on behalf of HBP. At the time the Agreement was executed in May 1985, it is clear that Bradshaw was a responsible person under § 6672. Bradshaw could not cease to be a responsible person simply by ceding to the Bank the right to exert financial control over HBP. *See Rykoff v. United States,* 40 F.3d 305, 308 (9th Cir.1994) ("the fact that a bank exercises significant control over payments to creditors does not necessarily absolve the corporate officer of liability under § 6672"); *cf. Gustin v. United States,* 876 F.2d 485, 491–92 (5th Cir.1989) ("[o]ne does not cease to be a responsible person merely by delegating that responsibility to others"); *Charlton,* 2 F.3d at 240 ("[t]he delegation of disbursal authority does not relieve the delegator of liability").

When the Bank refused Bradshaw's request to pay the taxes, Bradshaw could have resigned his position with HBP or refused to sign any checks and shut down the business. *See Howard,* 711 F.2d at 734 (the fact that a corporate officer might have been fired if he had disobeyed the CEO's orders to not pay withholding taxes did not make him any less responsible for payment of the taxes); *Hochstein,* 900 F.2d at 549 (even though controller of corporation might have been fired for paying withholding taxes, "these adverse consequences simply are no excuse for failing to collect and pay" them); *cf. Raba,* 977 F.2d at 945 (declining to hold that lack of check-signing authority is dispositive of lack of responsibility, noting that to so hold would "open the door to a host of evasive tactics[,] [o]fficers with otherwise unfettered authority simply would deprive themselves of permission to sign corporate checks in order to avoid the designation of 'responsible person.'"). However, Bradshaw neither resigned nor shut down HBP. Instead he continued the business and signed checks to *other* creditors. The result was that other creditors were favored over the government. These circumstances were a foreseeable result of the terms of the Agreement and are therefore directly attributable to Bradshaw's act of entering the Agreement on HBP's behalf.

"To permit corporate officers to escape liability under section 6672 by entering into agreements which prefer other creditors to the government would defeat the entire purpose of the statute." *Kalb,* 505 F.2d at 510. It may seem harsh to require a corporate officer in Bradshaw's position to resign or shut down his business in order to avoid liability under § 6672. However, we believe that although the statute is harsh, "the danger against which it is directed ... is an acute one against which, perhaps, only harsh measures are availing." *Wright v. United States,* 809 F.2d 425, 428 (7th Cir.1987).

Bradshaw argues that we should follow *Alsheskie v. United States,* 31 F.3d 837 (9th Cir.1994), and conclude that he is not a responsible person. In *Alsheskie,* Pro Quality Manufacturing, Inc. defaulted on a financing contract with Commercial Financing Services. Commercial Financing then took possession of Pro Quality's assets and formed Lion Manufacturing, Inc. to continue Pro Quality's operations. *Id.* at 838. Alsheskie became president and chairman of the board of Lion Manufacturing. Alsheskie's duties and powers "included (1) managing the corporation's day-to-day activities, (2) hiring and firing employees, (3) setting employees' wages, (4) signing payroll checks and checks to creditors and (5) preparing accounting records. He also prepared and signed all of Lion Manufacturing's tax returns." *Id.* at 838–39. Despite this authority, the district court there concluded that Alsheskie was not a responsible person.

A divided panel of the Ninth Circuit upheld the district judge's finding. In so holding the majority concluded "[Alsheskie's] authority was limited not by the directions of the owners of Lion Manufacturing ... but by the financing arrangement. He did not have 'significant control' over what bills to pay or not pay since that control remained, as the district court found, with the parent corporation, Commercial Financing." *Id.* at 839.

In his dissent, Judge Trott stated:

Not only does the majority's holding run counter to the facts in this case and the law of this and other circuits, it compromises the government's efforts to ensure

that taxes are withheld and paid over. Otherwise responsible officers of subsidiary companies can now excuse their failure to pay corporate taxes by claiming the parent company controlled the corporate finances. And responsible parties will continue to argue that their failure to pay over the taxes was not willful because they relied on the assurances of others that the taxes would eventually be paid. The majority has created an unfortunate loophole in what had been a potent weapon against tax fraud.

*Id.* at 841 (Trott, J., dissenting).

We believe the dissent in *Alsheskie* is the more persuasive view. Moreover the circumstances there differ from those before us.[6]

Bradshaw makes a separate argument dealing with the question of his liability for the late payment penalty on Heritage's 1985 fourth quarter taxes. He says the district judge properly addressed that issue separately in his findings and conclusions (the finding, *inter alia,* that there was an assessment made in November 1987 of $2,493.95 for the period ending December 31, 1985).[7] Bradshaw contends that Heritage paid the full amount of taxes for the last quarter of 1985 and did not pay the assessed penalty

based on an understanding that the penalty had been abated because Heritage was paying the full amount of taxes and interest. The district court further noted that when Heritage became aware that the penalty had not been abated, no employee of Heritage had the ability to or control of funds required to disburse monies to the IRS in payment of the penalty.

Brief for the Appellee at 11–12.

The trial judge's Finding 12 does state that the $40,963.37 payment on 1985 fourth quarter tax was made after discussion with

the IRS "in which plaintiff understood that [the IRS] would waive the penalty because taxes and interest were being paid." However we do not read this as finding any binding agreement or waiver of the 1985 late payment penalty assessed. The government, according to the finding, a few months later notified the company that the penalty had been reinstated. The fact that then the Bank controlled the funds and refused to pay the 1985 late payment penalty or any other withholding taxes presents the same question we have already resolved—that entering into an agreement that another institution may control disbursement of the company's funds does not absolve a corporate officer of liability under § 6672.

In sum, the Bank was able to seize control of HBP's finances only because Bradshaw, acting as president of HBP, entered into the Agreement which provided the Bank the opportunity to do so. Bradshaw thus participated in the arrangement which gave rise to the failure to pay HBP's taxes. We are convinced it was error to hold that Bradshaw was not a "responsible person" under § 6672 in these circumstances.

## B. Willfulness

### 1. *Standard of Review*

As with the previous issue, the government asserts that the determination of willfulness under § 6672 is a question of law subject to *de novo* review, while Bradshaw argues that it is a question of fact on which the district judge's ruling can not be overturned unless it is clearly erroneous.

Some circuits have held that the ultimate issue of willfulness is subject to *de novo* review. *United States v. McCombs,* 30 F.3d at 320 (noting, however, that this is a difficult

---

**6.** Alsheskie's authority stemmed from his position as president and chairman of the board of Lion Manufacturing. The creation of Lion Manufacturing was the result of a financing arrangement between Commercial Financing and Pro Quality. Although not explicitly stated in the opinion, it appears that Alsheskie did not participate in the creation of the arrangement which gave rise to Lion Manufacturing and his authority. Any lack of control which Alsheskie may have had resulted from an arrangement which he did not create. Here, however, any lack of authority to pay taxes was the result of an agreement Bradshaw made with the Bank.

**7.** In note 5, *supra,* Finding 12 states that a late payment penalty of $2,224.75 had been assessed with respect to the fourth quarter of 1985. The difference between the $2,493.95 and $2,224.75 figures is not explained, but they both appear to be related to the late payment penalty on the 1985 fourth quarter tax.

question that, in similar contexts, has divided the courts for over a century); *Thibodeau v. United States,* 828 F.2d at 1505–07. Our prior decisions have, however, treated this as an issue of fact. *See Taylor,* 69 F.3d at 417–18 (holding that the district court, sitting in review of the decision of the bankruptcy court, erred in concluding that plaintiff's failure to pay over taxes was willful because the bankruptcy court had made no findings on willfulness; we remanded for bankruptcy court findings); *Denbo,* 988 F.2d at 1033 (reviewing jury finding of willfulness without suggesting that the issue is other than one of fact); *Burden v. United States,* 486 F.2d 302, 304 (10th Cir.1973) (applying the clearly erroneous standard), *cert. denied,* 416 U.S. 904, 94 S.Ct. 1608, 40 L.Ed.2d 109 (1974).

We are, of course, bound to follow such prior decisions of this court. Here, however, we conclude that the district court's finding of no willfulness by Bradshaw must be reversed regardless of whether the clearly erroneous standard or the *de novo* standard of review is applied.

### 2. Did Bradshaw "Willfully" Fail to Pay Over the 1986 Withholding Taxes and the 1985 Late Payment Penalty?

▇▇▇ Only if Bradshaw "willfully" failed to collect or truthfully account for and pay over the 1986 taxes and the 1985 late payment penalty could he be liable under § 6672. Willfulness under § 6672 "means a voluntary, conscious and intentional decision to prefer other creditors over the Government." *Denbo,* 988 F.2d at 1033. "Willfulness is present whenever a responsible person acts or fails to act consciously and voluntarily and with knowledge or intent that as a result of his action or inaction trust funds belonging to the government will not be paid over but will be used

for other purposes." *Wright,* 809 F.2d at 428 (internal quotation marks and citation omitted). In *Denbo* we said:

> Although negligence does not give rise to section 6672 liability, " 'the willfulness requirement is … met if the responsible officer shows a "reckless disregard of a known or obvious risk that trust funds may not be remitted to the government…." ' " *Smith v. United States,* 894 F.2d 1549, 1554 n. 5 (11th Cir.1990) (quoting *Thibodeau,* 828 F.2d at 1505). A responsible person's failure to investigate or to correct mismanagement after being notified that withholding taxes have not been paid satisfies the section 6672 willfulness requirement. [Citation omitted].

988 F.2d at 1033.

Such is the case here. The district court found that Bradshaw repeatedly requested the Bank to pay the taxes. Findings at 6. It is clear that Bradshaw knew the taxes were unpaid. Moreover, Bradshaw's testimony at trial indicates that at the time the Agreement was negotiated and executed he was concerned with the payment of payroll taxes. And, as noted, Bradshaw's decision to enter the Agreement raised the specter that other creditors would be favored over the government. As in *Kalb,* Bradshaw "not only knew of but negotiated the arrangement with the bank under which other creditors were preferred to the government. He participated in the arrangement by signing checks while knowing that withholding taxes were not being paid." *Kalb,* 505 F.2d at 511.[8] Entering the Agreement was a knowing and intentional step which created the possibility that other creditors would be favored over the government.

When the Bank refused to approve checks for the taxes, Bradshaw could have resigned

---

**8.** We are mindful that as to one appellant, Herold, the Second Circuit remanded the issue of willfulness for trial. The court held, however, that there was no substantial question that appellant Kalb's failure to pay the tax was willful: he not only knew of but negotiated the arrangement with the bank under which other creditors were preferred to the government and he signed checks while knowing withholding taxes were not being paid. *Id.* at 511. There was, however, a triable issue of willfulness as to appellant He-

rold: the government did not deny his claim that he did not know withholding taxes were not being paid; he was only purchasing agent for the company, with little understanding of financial matters and payment of taxes was made by others. *Id.* at 511. Obviously, Bradshaw's position here is like Kalb's, not Herold's, with the first basic distinction being that Bradshaw clearly knew the withholding taxes of HBP were not being paid.

or refused to sign any checks and shut down HBP. His decision to stay on, continue the business, and pay other creditors after the Bank's refusal to approve payment of the taxes, when considered in light of the Agreement, leads to the conclusion that his failure to pay the 1986 withholding taxes and the 1985 late payment penalty was willful. The district court's finding to the contrary was clearly in error.

## III

Accordingly, we **REVERSE** the judgment of the district court with respect to plaintiff Bradshaw's liability under 26 U.S.C. § 6672 of $27,764.54, found traceable to the tax assessment by the district judge as reflected in his December 23, 1993, order noted. The judgment in plaintiff's favor as to the remaining $6,814 awarded him because of his overpayment of tax is not disturbed. We **REMAND** the case with directions to enter judgment for the United States in accordance with this opinion.

## ORDER ON REHEARING

### April 18, 1996

On consideration of the petition for rehearing and the response, the court finds and concludes as follows:

In his petition Bradshaw asserts that "[t]he Court should have relied upon the 1986 Liquidation Agreement inasmuch as it is this agreement which controlled and dictated the relationship between Heritage and Zions Bank, during the period in which withheld employee taxes for the first, second and third quarters of 1986 were due and payable." Petition for Rehearing at 15. He argues that this 1986 Liquidation Agreement superseded

---

**1.** Even assuming that Bradshaw's assertion that the Bank's control over HBP's finances was not authorized is correct, that still would not demonstrate that Bradshaw was not a "responsible person." If the Bank was breaching its obligations to Bradshaw, Bradshaw should have refused to sign any checks for creditors other than the government. He should have demanded that the Bank authorize the payment of taxes and if the Bank refused, he could have resigned and ceased doing business. Thus, Bradshaw's assertion that the Bank "independently instituted" a change in the banking operations, Petition at 4, is beside the point. Even if the Bank lacked authority to do what it did, that does not excuse

the May 1985 Agreements and that under this "controlling" Liquidation Agreement he is not a responsible person.

### Fourth Quarter 1985 Penalty and First and Second Quarter 1986 Taxes

 Because the Liquidation Agreement was not executed until August 6, 1986, Bradshaw cannot rely on it as to any taxes or penalties accruing prior to that date. Therefore the Liquidation Agreement is irrelevant to Bradshaw's failure to pay the fourth quarter 1985 penalty and first and second quarter 1986 taxes. Rather the May 1985 agreement was the operative agreement in place when those obligations accrued. However, as we explained in our opinion, Bradshaw cannot use the May 1985 agreement to excuse his failure to pay the taxes.[1]

### Third Quarter 1986 Taxes

 As for the third quarter 1986 taxes, even assuming Bradshaw can rely on the August 6, 1986 Liquidation Agreement, he was still a responsible person under § 6672.

Bradshaw asserts that "Heritage could not remit withholding taxes due on employee wages for the first, second, and third quarters of 1986 because Heritage assets were completely controlled by Zions Bank, and Zions Bank would not release funds for payment of such taxes *despite Zions Bank's obligation to do so under the 1986 Liquidation Agreement* and Bradshaw's repeated requests." Petition at 11 (emphasis added). The relevant paragraphs of the Liquidation Agreement provide as follows (the term "Borrowers" refers to Bradshaw, the various Heritage entities, and R. Lamar Bradshaw; "Zions" refers to the Bank).[2] Bradshaw asserts that the deletion of the last sentence of

---

Bradshaw's continuing his business and paying other creditors in the face of unpaid tax obligations.

**2.** The Liquidation Agreement provided in part:

12. Except as expressly provided in this paragraph 12, the Borrowers each represent that, after diligent inquiry, to the best of their knowledge and belief, they have fully complied and will continue to fully comply with all applicable laws, statutes, rules, regulations, orders, and restrictions of any domestic or foreign governmental authority having jurisdiction over any of the Borrowers, their busi-

¶ 12 (which had said "The individual Borrowers may have personal liability for such taxes") "clearly illustrates the intent to remove the personal liability for the taxes from the individual borrowers and **require** payment of the taxes through the provisions stated in paragraphs 20 and 30." Petition for Rehearing at 7 (emphasis in original). He concludes "under the controlling 1986 Liquidation Agreement, Heritage was to have access to liquidation proceeds in order to remit the withheld employee taxes. *The power of Zions Bank to refuse to honor checks made payable to the Internal Revenue Service was not a power ceded to Zions Bank by Bradshaw or any one else on the part of Heritage, through this or any other agreement.*" Petition for Rehearing at 7–8 (emphasis in original). We disagree.

As noted in our opinion, the power to refuse to honor checks made payable to the IRS was ceded to the Bank by Bradshaw through the May 1985 agreement. *See* maj. op. at 1180. Moreover, Bradshaw misinterprets the Liquidation Agreement. He reads ¶¶ 12, 20 and 30 to mean that "the first obligation to be satisfied from the assets of Heritage was the remittance of any tax obligations of Heritage." Petition for Rehearing at 7. However, nowhere in these or any other provisions of the Liquidation Agreement does the Bank agree to honor checks to

pay the taxes.[3] In light of Bradshaw's knowledge that the taxes were not being paid and that the Bank had refused his previous requests to approve checks to the IRS, Bradshaw could have insisted on such a provision. He did not. Thus, there is nothing in the Liquidation Agreement which absolves Bradshaw of his obligation to see that the taxes were paid. Therefore, for the third quarter 1986 taxes Bradshaw was a "responsible person."

### Willfulness

Bradshaw states that he "insisted on the inclusion in the 1986 Liquidation Agreement of provisions for the payment of taxes, with the full knowledge that like provisions were not provided in the May 1985 Agreements" and that he "operated under the belief that as negotiated and agreed to, those taxes would be paid as funds became available through Zions Bank's liquidation of Heritage assets." Petition for Rehearing at 13. Therefore, he argues, he "did not at any point make a voluntary, conscious and intentional decision to not effect payment of the withheld taxes to the United States." *Id.* We disagree.

For the fourth quarter 1985 penalty and the first and second quarter 1986 taxes, Bradshaw's voluntary agreement to cede

nesses, or their properties. *To the best of the Borrowers' current knowledge, the Borrowers currently owe state and federal taxes which are due and unpaid,* and which are fully disclosed on financial statements furnished to Zions and on Exhibits to this Agreement.

20. *Surrender of Personal Property.* Contemporaneous with the execution of this Agreement, and continuing thereafter, the Borrowers shall surrender possession to Zions of all personal property described in the Inventory and Accounts Receivable Security Agreement, as amended, the Business Security Agreement and the Trust Deeds identified in paragraph 2 above, and shall fully cooperate and assist Zions in disposing of such personal property in accordance with all of Zions' existing legal and equitable rights and remedies. The Borrowers shall receive full credit against the loans described in subparagraphs 1(a), 1(b) and 1(c) above for any proceeds of such disposition received by Zions, after payment of any costs and expense of such disposition, including reasonable attorney's fees and legal expenses incurred by Zions and compensation to J. Larry Bradshaw in accordance with paragraph 23 below, and after payment of $5,000 to counsel

for the Borrowers in accordance with paragraph 27 below, *and after the payment of any taxes and assessments under paragraph 30 below.*

30. *Taxes and Assessments.* Except on that real property transferred in fee to Zions, as set forth in paragraph 19 above, *the Borrowers covenant that the Borrowers shall pay, when due, from the proceeds of disposition of property as described in paragraph 20 above, all lawfully imposed taxes on the property described in paragraphs 2 and 3 above and all other lawfully imposed taxes,* except and so long as the Borrowers lawfully contest such taxes in good faith and set aside adequate reserves therefore. Appellee's Supplemental Appendix at 80, 84–85, 92 (emphasis added).

3. Paragraph 12 merely acknowledged that the Borrowers owed state and federal taxes. Paragraph 20 described the method for determining how the Borrowers would receive credit against their loans for the proceeds of the disposition of assets. In ¶ 30, the *Borrowers* agree to pay lawfully imposed taxes from the disposition of property.

power over the accounts to the Bank in the event of default, coupled with his knowledge that other creditors were being paid when the IRS was not, is sufficient to make his failure to pay the taxes willful. As for the third quarter 1986 taxes, there is nothing in the Liquidation Agreement which requires the Bank to pay the taxes from the liquidation proceeds. Instead, it was Bradshaw and the other Borrowers, who agreed to pay the taxes out of the proceeds. Liquidation Agreement ¶ 30, Appellee's Supplemental Appendix at 92. There is nothing in the Liquidation Agreement that alters the Bank's power to refuse to honor checks to the IRS. Bradshaw could have insisted on such a provision, but did not. His failure to do so in the face of his knowledge of the unpaid tax obligations satisfies us that he voluntarily and consciously failed to pay the third quarter taxes, and therefore his failure to pay was willful.

Finally, as noted in our opinion, Bradshaw could have resigned and shut down the business when the Bank refused to approve the payment of the taxes. Instead he voluntarily continued to conduct business, and later carried out the liquidation of the business, with full knowledge of the unpaid taxes. We are convinced that his failure to pay the taxes was willful.

Accordingly, the petition for rehearing is **DENIED.**