LYNCH, Circuit Judge,
dissenting.
I dissent in this case, despite great respect for my brethren, because I believe the majority opinion is based upon significant errors of law.
A. Inconsistency With Prior Decision
In Vinick v. Commissioner, 110 F.3d 168 (1st Cir.1997) (“Vinick I ”), this court twice stated that the facts presented in this case would permit a reasonable inference that Arnold W. Vinick was a “responsible person” for purposes of 26 U.S.C. § 6672(a). We said that the record contained sufficient evidence “from which one could infer Vinick’s responsibility as a matter of fact.” Id at 173. We also noted, with regard to evidence limited to the periods during which the taxes were not paid, “[f]rom these indicia alone, one might infer that Vinick was a responsible person.” Id. at 172. Yet now, after the trial judge has actually heard the same evidence, including testimony from Vinick that was contradicted in material respects by every other witness, the majority concludes that the trial judge erred in determining that Vin-ick was a responsible person. That alone is both passingly odd and at odds with the law of the case doctrine.
B. Standard of Review
The majority empowers itself to reverse the district court by treating the question of whether Vinick is a “responsible person” as a question of law. But the standard of review utilized by this court in § 6672 cases is review for clear error. The majority says it is entitled to decide the question de novo because the district court committed an error of law. That error of law, according to the majority, is that the district court “considered Vinick’s conduct over the entire period he was involved with Jefferson Bronze rather than his activities during the quarters in question.” There was no error of law, as it was well within the district court’s discretion to admit this evidence and determine what weight to give it. There is no reason to think the district court gave undue weight to this evidence. Also, Vinick may not be heard to complain on these grounds as he introduced much of the evidence in question and did not object to the evidence the government introduced, and so has waived this argument. Finally, there was no error, much less clear error, in the district court’s factual determinations.
It is settled law in this circuit that a trier of fact’s determination of whether a taxpayer had sufficient control over a corporation to be deemed a responsible person is subject to clear error review. In Caterino v. United States, 794 F.2d 1 (1st Cir.1986), we said,
This court cannot reverse merely because it is convinced that it would have decided the question differently; we must ascertain whether the finding of fact is clearly erroneous. We must affirm if the finding is reasonably supported by the record as a whole. We must reverse when a review of the entire evidence leaves this court with the definite and firm conviction that a mistake has been committed.
Id. at 5 (internal quotation marks and citations omitted); accord Harrington v. United States, 504 F.2d 1306, 1313 (1st Cir.1974) (affirming jury finding of respon *16 sibility “[s]ince the jury could properly have found that [the taxpayer] was the person with responsibility for the taxes”). We have viewed this as a fact dominated determination and so give deference to the trial judge. See Caterino, 794 F.2d at 6 (“We conclude that the district court’s finding that Caterino had sufficient power ... to control what creditors [the corporation] would pay is not clearly erroneous. Therefore, its conclusion that Caterino is ‘responsible’ within the meaning of section 6672 is not incorrect.”).
The majority of circuits review the responsible person determination for clear error as well. See Ghandour v. United States, No. 97-5062, 1997 WL 716143, at *1, 132 F.3d 52 (Fed.Cir. Nov.17, 1997) (unpublished); United States v. Jones, 33 F.3d 1137, 1139 (9th Cir.1994); United States v. Running, 7 F.3d 1293, 1297 (7th Cir.1993); Raba v. United States, 977 F.2d 941, 943 (5th Cir.1992); Donelan Phelps & Co. v. United States, 876 F.2d 1373, 1374 n. 2 (8th Cir.1989); Williams Indus. v. United States, No. 87-2630, 1988 WL 92869, at *1, 857 F.2d 1470 (4th Cir. Sept.6, 1988) (unpublished); Sinder v. United States, 655 F.2d 729, 731 (6th Cir.1981). Two circuits approach the issue differently. See Bradshaw v. United States, 83 F.3d 1175, 1178 (10th Cir.1995) (stating that determination of responsible person status presents mixed question of law and fact, subject to de novo review); United States v. McCombs, 30 F.3d 310, 319 (2d Cir.1994) (reviewing findings regarding the taxpayer’s role in the company for clear error, but giving plenary review to conclusion that taxpayer’s role made her responsible under § 6672). In addition, the other circuits have correctly viewed this court’s standard of review as being the clearly erroneous standard. See, e.g., Bradshaw, 83 F.3d at 1178 n. 4; Running, 7 F.3d at 1297; Hochstein v. United States, 900 F.2d 543, 546 (2d Cir.1990).
To support its departure from clear error review, the majority cites to a number of Supreme Court and First Circuit cases for the unremarkable proposition that a reviewing court is not bound by the clearly erroneous standard where the trial court has committed an error of law. In the two Supreme Court cases and the First Circuit case cited by the majority in which there was departure from the clear error standard of review, the trial courts had committed obvious and important errors of law. In United States v. Parke, Davis, & Co., 362 U.S. 29, 43-44, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), the trial court had erroneously found that the lack of an express or implied agreement to suppress competition precluded finding a violation of the Sherman Act. In United States v. Singer Manufacturing Co., 374 U.S. 174, 193-95, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963), the trial court similarly misunderstood the nature of what would suffice to constitute a violation of the Sherman Act. In Brown Daltas & Associates, Inc. v. General Accident Insurance Company of America, 48 F.3d 30, 37 (1st Cir.1995), the trial court had an erroneous view of which party bore the burden of proving a material element in the case.[1]
The majority opinion is simply wrong when it says that there was legal error on the part of the district court in this case. The record demonstrates that the district court understood both the nature of the inquiry into responsibility under § 6672 and the factors that were relevant to this inquiry.[2]
*17 C. Standards Guiding the Determination
The majority opinion is based upon, errors of law both as to the rules it states and as to the application of otherwise correct rules. The majority thrice errs. First, the majority opinion creates a new and erroneous legal rule: that evidence from tax quarters outside of the quarters at issue may not be considered. There is no support given for this new rule, and it is contrary to the law. Second, the majority opinion pays lip service to the rule that the burden of proof is on the taxpayer and then ignores that principle. Third, the majority departs from circuit precedent by moving from a flexible, multi-factored approach to a single focus of decisive weight. Instead of regarding the individual factors as elements contributing to an overall picture of Vinick’s status, the majority opinion notes for each factor that weighs in favor of responsibility that such an individual factor, alone, is insufficient to create responsibility. But factors do not stand alone, and the district court correctly considered them in aggregate.
1. Consideration of Evidence from Outside the Tax Quarters at Issue
The district court properly considered evidence from outside of the quarters at issue so that it could determine Viniek’s status, authority, and control during the pertinent quarters. No court, to my knowledge, has ever before held that it is error for a trier of fact to admit evidence from quarters other than the quarters during which the taxes were not paid and then to consider what weight to give to this evidence.
The district court acted in accord with the Federal Rules of Evidence in admitting evidence that has a tendency to prove or disprove a material fact (and thus is relevant), See Fed.R.Evid. 401-402. Courts regularly admit evidence of prior or later transactions, occurrences, and statements to prove material elements of cases. ' In corporate veil-piercing cases, which are analogous to the present case, courts consider evidence from outside of the period at issue to determine whether the principal should be held personally liable to the corporation’s creditors. In Crane v. Green & Freedman Baking Co., 134 F.3d 17 (1st Cir.1998), a union benefits plan sought to pierce the veil of a corporation to recover unpaid sums from the corporation’s principals. In reversing summary judgment for the defendants, this court found “[particularly flagrant ... the evidence of a personal vacation that the [principals] financed with corporate funds.” Id. at 24. The court weighed the evidence of this vacation, which took place in January 1991, against the principals, even though the corporation failed to make payments to the benefits plan more than a year later, in April 1992. See id. at 20, 24. The court also considered evidence of checks from the corporate account that were made to the defendants beginning in January 1991. See id. at 24. Similarly, in Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc., 754 F.2d 10, 16 (1st Cir.1985) — another veil piercing case — this court held that summaries of corporate *18 checks made to the defendants were admissible as proof of the lack of separate corporate and individual identities even though the checks were made after the debt sued upon had been incurred.
Courts consider this type of temporally removed evidence in other situations as well. In fraud or misrepresentation cases, “proof that the defendant perpetrated similar deceptions frequently is received in evidence.” 1 McCormick on Evidence § 197, at 695 (John W. Strong ed., 5th ed.1999); see, e.g., Whittaker Corp. v. Execuair Corp., 736 F.2d 1341, 1347 (9th Cir.1984). Also, “when the authority of an agent is in question, other similar transactions that the agent has carried out on behalf of the principal are freely admitted.” 1 McCormick on Evidence § 198, at 698; see also 2 Wigmore on Evidence § 377, at 392-93 (James H. Chadbourn rev.1979).
In the context of prosecutions for conspiracy to deceive immigration authorities through phony marriage ceremonies, the Supreme Court has held that evidence from the period after the conspiracy has ended is admissible to prove the spuriousness of the marriage and the intent of the parties. See Lutwak v. United States, 344 U.S. 604, 617, 73 S.Ct. 481, 97 L.Ed. 593 (1953). This court has allowed admission of post-conspiracy evidence in a criminal conspiracy case to prove the existence of the conspiracy and the defendant’s participation. See United States v. Fields, 871 F.2d 188, 197 (1st Cir.1989).[3]
Finally, in torts cases, evidence from before or after an accident has occurred is admissible for a number of purposes. See, e.g., Espeaignnette v. Gene Tierney Co., 43 F.3d 1, 5-10 (1st Cir.1994) (holding that district court abused its discretion in refusing to admit evidence of modification of saw to prove feasibility in design defect case and holding that evidence of lack of prior accidents was properly admitted to prove absence of defect and lack of causation); Clausen v. Sea-3, Inc., 21 F.3d 1181, 1189-92 (1st Cir.1994) (holding that it was not plain error for district court to admit evidence of remedial measure taken three years after accident to prove defendant’s control over area in which accident occurred).
In this case, Vinick’s exercise of authority outside of the quarters in question sheds light upon the authority he had during the quarters in question. That he helped negotiate refinancing before the quarters in question suggests that he would have done so during the quarters in question. That he previously took steps to remedy the company’s non-payment of taxes is also relevant to his authority and control during the pertinent quarters, as is the fact that he helped take the company into and through bankruptcy proceedings. Such evidence is relevant and, therefore, admissible. The trial court correctly concluded that it could admit, in this bench trial, evidence from outside the quarters in question, appropriately adjusting the weight such evidence would be given. There was no error.
Evidence from outside of the quarters in question serves an especially important role where, as here, taxes were not paid for a relatively short period. It could easily be the case that a person with significant authority and control in a company has no occasion to exercise that authority and control during a short period — for ex *19 ample, when no major decisions need to be made and no significant events occur. Although this may be purely a matter of luck, the majority opinion renders it potentially impossible in this type of situation to find that a person who actually has the authority to pay the taxes is a responsible person.
Further, Vinick has waived the issue of the district court’s consideration of evidence from outside the quarters in question. Where an appropriate, contemporaneous objection has been made, this court reviews admissions of evidence for abuse of discretion. See Varano v. Jabar, 197 F.3d 1, 4 (1st Cir.1999). While Vinick made a motion in limine requesting that the government’s evidence be limited “to the periods at Issue in the case at Bar,” it was Vinick who introduced much of the evidence from outside of the quarters in question and thus waived the objection. See Gill v. Thomas, 83 F.3d 537, 541 (1st Cir.1996). Moreover, Vinick never objected to the government’s introduction of such evidence. Therefore, review of the district courts evidence determinations is for plain error. See Varano, 197 F.3d at 4; Clausen, 21 F.3d at 1190.
Vinick testified on direct examination regarding his involvement in hiring Ron Ouellette, signing Heritage Bank cheeks, the initial $165,000 financing, the $300,000 refinancing, and Jefferson Bronze’s bankruptcy. Vinick also introduced evidence of Jefferson Bronze checks from before the quarters in question — checks that lacked his signature — to prove that he never exercised his check signing authority before the bankruptcy. On cross-examination, Vinick was questioned without objection regarding his negotiating a payment plan with the IRS during Ouellette’s tenure. Vinick called two employees from Heritage Bank as witnesses and questioned them about the checks he had signed after the quarters in question. Vinick made no objection to the government’s questioning of Eliot Rothwell, a National Grand Bank employee, regarding Vinick’s involvement in the $300,000 refinancing. Vinick made no objection to the government’s questioning of Ouellette regarding the frequency and amount of information Vinick received about Jefferson Bronze during Ouellette’s tenure. Vinick made no objection to the government’s questioning of Richard Letterman as to Vinick’s role in the original $165,000 financing and in the $300,000 refinancing. Vinick made no objection to the government’s questioning of Letterman regarding Vinick’s role in negotiating with the IRS during Ouellette’s tenure, Vinick’s involvement in hiring and firing decisions, and Vinick’s involvement in the company’s bankruptcy. Nor did Vinick object to the questioning of Letterman’s wife regarding the frequency and amount of information Vinick received during her husband’s tenure and the number of Heritage Bank checks Vinick signed.
It was not an abuse of discretion, much less plain error, for the district court to admit this evidence, which clearly had a tendency to prove Vinick’s authority and control.
2. The Burden of Proof
As to the burden of proof, these cases usually involve a company that has withheld taxes from employees’ wages and has then failed to pay the; taxes to the government. In the meantime, the company has typically used the withheld funds to pay other creditors. Because the employees are held harmless and credited with the amounts withheld, the U.S. taxpayer often makes up the difference. In order to deter this behavior and lessen the costs imposed on other taxpayers, Congress has imposed a duty on persons whom the law deems responsible to collect, account for, and pay the taxes. Thus, the question is not who in the company ordinarily pays the taxes, but upon whom the law imposes a duty to see that the taxes are paid.
In keeping with the social policy objectives of § 6672, the burden of proof is on a taxpayer whom the IRS believes is a responsible person to prove that he is not a *20 responsible person. See Caterino, 794 F.2d at 5. We have said that this may be a harsh rule, see id., but it is designed to protect the government and our nation’s taxpayers from tax scofflaws, see Harrington, 504 F.2d at 1311. The district court, not the majority, has it right. Under the relevant tests, Vinick did not carry his burden of proof to show that he was not a responsible person.[4]
3. The- Responsible Person Factors Should be Viewed in Aggregate
In keeping with the social policy objectives, “[cjourts have explicitly ■ given the word ‘responsible’ a broad interpretation.” Caterino, 794 F.2d at 5. Since the term “responsible” is far from self-defining, we have generally looked to indicia of responsibility such as “the holding of corporate office, control over financial affairs, the authority to disburse corporate funds, stock ownership, and the ability to. hire and fire employees.” Thomsen v. United States, 887 F.2d 12, 16 (1st Cir.1989). This was the standard the district court applied, and correctly so.
Until now, this court has never suggested that the factors fell into an exclusive trinity or that the factor of day-to-day decision-making authority over company operations was the dispositive factor. The majority’s suggestion that control over the company’s day-to-day affairs is central to the responsible person determination conflicts with circuit precedent. In Harrington, this court held there was “no error in the court’s charge [to the jury] that an individual need not be in day to day control of the administrative and financial aspects of the business in order to be [a] responsible person within the meaning of Section 6672.” Harrington, 504 F.2d at 1315.
The majority opinion also skews normal appellate review, dismissing each factor pertaining to responsible person status by saying that that factor alone cannot support a responsible person determination. For example, the majority opinion states: “titular authority is insufficient,” “not all shareholders are responsible persons,” “occasional involvement in business affairs is insufficient,” “[possession of [check signing] authority ... is not enough.” But factors in combination can describe sufficient authority or control to render someone a responsible person.
D. Record Support for the Determination
This case comes to us after trial, and we are required to draw all inferences from the evidence in favor of upholding the verdict. See United States v. Ven-Fuel, Inc., 758 F.2d 741, 744-45 (1st Cir.1985). Although the majority opinion recognizes this principle, it does not follow it; it could not do so and reach the result it does.
This picture emerges from the evidence: Vinick owned half the company and was one of its incorporators. He was, throughout, its treasurer and one of only two directors. During the periods in question, there were only two corporate officers, Vinick and Letterman. When Letterman, Vinick, and Peter Mayer bought the company in 1981, Vinick agreed, both personally and in his capacity as treasurer, to reimburse the former owner for any taxes owed. Vinick signed the note and pledged his house as security for the original financing of $165,000 with the Small Business Administration (“SBA”). This gave him a strong incentive to stay involved in what the company was doing, and Vinick did keep abreast of the company’s financial situation. He prepared all of the tax returns, including returns when the company lacked funds to pay the taxes. In order to prepare the taxes, he was given regular information about income and expenses. Indeed, throughout his relationship with the company he received more information *21 than that. He was regularly given copies of the check registers and reviewed information on a weekly basis from those actually operating the company. His activities went beyond those of a mere accountant.[5]
Although the district court did not decide the issue, Vinick appears to have played a significant role in hiring and firing. In 1983, after the SBA complained to Vinick about Mayer, the first operations manager, Vinick and Letterman decided to remove Mayer. Vinick then asked Ouel-lette to run the company. In 1988, when Ouellette had problems, Letterman moved into the position, doing so with Vinick’s tacit approval.
In 1985, when the company could not pay its withholding taxes, Vinick and Letterman (but not Ouellette, the company’s day-to-day manager) went to see the IRS, and Vinick worked out a settlement agreement and payment schedule that Ouellette followed. This effort belies the majority opinion’s suggestion that Vinick was merely a passive investor. The fact that Vinick did not keep the checkbook or write the checks did not stop him from exercising his authority to correct this problem with the IRS, and there is nothing to indicate that, having exercised this authority in 1985, he did not have such authority in 1989 and 1990.
Throughout, Vinick had check-signing authority. He chose not to exercise any such authority until the company went into bankruptcy in mid-1990. If he had regularly signed checks, the IRS would have had a stronger case. But that he chose not to sign checks until later does not negate his authority to do so during the quarters in question. Indeed, when he did exercise check-signing authority during the bankruptcy period, he even went to the bank to complain that it was letting checks go through without his signature on them.
The quarters when the taxes were not paid were the last three quarters of 1989 and the first two quarters of 1990. The majority opinion asserts that there was a sea change in the operations of the company during those quarters. That is not so. It is true that Letterman took control of day-to-day operations of the company in 1988, and his wife acted as the bookkeeper. It is also true that Vinick then reduced his involvement in the day-to-day operations. But it is not true that he reduced his involvement in the financial affairs of the company.
The majority opinion is simply incorrect when it states that “the record is undisputed that Vinick became less involved in the financial affairs of the corporation as Let-termaris role increased.” When Ouellette ran the day-to-day operations, Vinick discussed the company’s financial condition with him “on a monthly basis.” In contrast, when Letterman ran the day-to-day operations, Vinick reviewed the company’s financial condition at least weekly, and often more frequently. Letterman testified that he and Vinick had weekly conversations about how the company was doing, that Vinick saw the weekly receipts from customers, and that Mrs. Letterman “brought him everything [they] did.” Mrs. Letterman testified that she brought Vin-ick the company’s income and expense information at least weekly, and more frequently at the end of the month. The judge was entitled to accept the Letter-mans’ testimony over Vinick’s contradictory testimony that he got such information at most once a month. In fact, Richard Letterman testified that Vinick was privy to all information about what was happening at all times. Nor did Vinick’s other financial activities lessen. Just as before, Vinick prepared the tax returns and the profit and loss statements. Just as before, he refused to sign the returns and told others to do so.
*22 When there were major decisions to be made, Vinick made them together with Letterman. The two of them decided in mid-July of 1990 that the company had to be put into bankruptcy. Vinick went to the bankruptcy court, and he started signing company checks that he had always had the authority to sign. At trial, Vinick attempted to minimize his role in the running of the company at this stage, but his testimony was contradicted by others. For example, Vinick claimed he signed the vast majority of checks only after they had been negotiated with only Letterman’s signature. Two bank officials and Letterman’s wife all said he signed most checks before negotiation.
But it is what happened during and around the quarters in question that reinforces that the district court’s conclusion was not error. The district court quite properly weighed in Vinick’s favor the fact that he did not run the company day-today. But it is also true that when the company ran into financial problems, Vin-ick played a considerable role. In May of 1988, the company secured a $300,000 loan from National Grand Bank, refinancing its earlier $165,000 loan and obtaining additional operating capital. Vinick and Letterman met with Eliot Rothwell, a bank official, two or three times to secure the loan. Rothwell found Vinick to be familiar with the company’s financial condition. Vinick signed the loan application and then signed the note both in his individual and corporate capacities. Vinick and Letterman each personally guaranteed the loan, and there is evidence that each pledged his home. The bank encouraged them to open an account there for the company; Vinick and Letterman were the signatories. Vin-ick said there was a separate $300,000 loan from Bank of New England that was made personally to him and to Letterman, that the money was put into the company, and that he gave a mortgage on his home for this loan. In any event, if the obligations to National Grand Bank were not met, Vinick was personally in jeopardy. In fact, Vinick’s interest in being involved in the company’s financial affairs had now become even greater than it was originally, as the amount for which he was personally liable had almost doubled. This helps explain his weekly review of the company’s finances during Letterman’s tenure.
In early 1989, just before it stopped paying its taxes, the company became delinquent on the National Grand Bank loan. Vinick and Letterman then met several times with Rothwell to try to work out the problem. Again, Rothwell found Vinick knowledgeable about the company’s financial affairs. Vinick was well aware during this period that the company was not paying the taxes withheld from employees. Vinick did not do what he had done in 1985, which was to try to work out matters with the IRS and negotiate a plan to pay the taxes owed. In essence, it is fair to infer that he and Letterman together decided to treat the IRS as a second-best creditor and put their efforts and the company’s payments toward the bank, to which they had immediate personal liability. But that is not what the law permits. See Donelan Phelps, 876 F.2d at 1377. The record amply supports a finding that Vinick was a responsible person.
This is not a case, as the majority would have it, of a passive investor unfairly being saddled with § 6672 liability. Such investors do need protection, a fact that was amply demonstrated by the government’s aggressive and overreaching posture at oral argument. The evidence in this case, however, showed that Vinick was not merely a passive investor. On the evidence presented, Vinick could have been, and was, deemed a responsible person. As such he had a duty to ensure that the taxes were paid. Given the degree of his involvement and control over financial and other matters in the company, Vinick could not avoid that duty by refusing to write checks to the IRS that he had the authority to write, by refusing to sign tax returns that he had the authority to sign, and by *23 failing to meet with the IRS when he had the authority to do so.
E. Disposition on Appeal
Even if the majority opinion were correct in asserting that the district court had a mistaken impression of applicable legal principles, then the proper disposition would be to remand the case to the district court, not to decide the case ourselves. Where the evidence “does not compel a ruling for either side,” the proper course is to remand the case to the trial court. TEC Eng. Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 545 (1st Cir.1996). It cannot be said that the record compels a finding that Vinick was not a responsible person.
But for his dissembling at trial, there is a temptation to feel sorry for Vinick. His investment in this small company has led to a nightmare for him. Yet, it was not his investment alone that led to his being a responsible person, nor was it merely his title as treasurer. Crediting the entire record, there was no error in the trial judge’s decision, and I dissent.

. Furthermore, Brown Daltas does not state that a reviewing court should apply de novo review when a trial court's factual finding has been affected by legal error. The language is more modest, noting that in this situation a "reviewing court is not bound by the clearly erroneous standard” and that the trial court’s findings should be "accorded diminished respect on appeal.” Brown Daltas, 48 F.3d at 36 (internal quotation marks and citation omitted).

. The majority's departure from the clear error standard will cause problems in a related area: the taxpayer’s right to a jury trial. Is the majority contending that a jury must be instructed it cannot consider any evidence from outside the period in question?
*17 While the First Circuit has not specifically ruled on the question of whether the Seventh Amendment right to a jury trial obtains in proceedings in which the government seeks to recover unpaid taxes, cases have routinely come to us after jury determinations of whether a party is a responsible person. Both Thomsen v. United States, 887 F.2d 12, 13 (1st Cir.1989) (involving a § 6672 action), and Harrington involved appeals from jury trials. We have applied clear error review to the responsible person determination in both bench and jury trials.
Other circuits have addressed the question and have found that the Seventh Amendment right to a jury trial does exist in this situation. See United States v. McMahan, 569 F.2d 889, 892 (5th Cir.1978) (holding right to jury trial exists in § 6672 recovery suit brought by government); cf. Damsky v. Zavatt, 289 F.2d 46, 51 (2d Cir.1961) (holding, in part, that right to jury trial exists in action by government to recover federal income taxes).

. Similarly, Federal Rule of Evidence 404(b) specifically enumerates a list of purposes for which evidence of other “crimes, wrongs, or acts’’ is admissible. See, e.g., United States v. Tse, 135 F.3d 200, 208 & n. 6 (1st Cir.1998) (holding that evidence of a subsequent crime was admissible to show that defendant was "constantly trying to maintain his dominance” as leader of a gang); United States v. Fulmer, 108 F.3d 1486, 1501-02 (1st Cir.1997) (holding that statements by defendant made prior to conduct for which he was charged was admissible to prove motive and intent); United States v. Spinosa, 982 F.2d 620, 628-29 (1st Cir.1992) (holding that evidence of prior possession of cocaine was admissible to prove knowledge and intent); see generally 2 Weinstein's Federal Evidence § 404.20 (Joseph M. McLaughlin ed., 2d ed.1999).

. The majority opinion even suggests that it viewed the burden of proof as the government’s, stating that “the government introduced no evidence indicating that during the relevant quarters, Vinick had any involvement in the day-to-day operations.”

. Vinick denied he acted as the company’s accountant; this was contradicted by other witnesses.