USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 97-1133 SANDRA CRANE, FUND MANAGER, Plaintiff, Appellant, v. GREEN & FREEDMAN BAKING COMPANY, INC., ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Edward F. Harrington, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Coffin and Campbell, Senior Circuit Judges. _____________________ ____________________ David C. Jenkins, with whom Matthew E. Dwyer, Christine L. __________________ _________________ _____________ Nickerson and Dwyer & Jenkins, P.C. were on brief for appellant. _________ _____________________ Adam S. Elman for appellees. _____________ ____________________ January 20, 1998 ____________________ CAMPBELL, Senior Circuit Judge. The terms of a _____________________ collective bargaining agreement required Green & Freedman Baking Company, a Massachusetts corporation, to make periodic payments on behalf of its unionized drivers to the New England Teamsters and Baking Industry Health Benefits and Insurance Fund. After experiencing financial difficulties, Green & Freedman ceased to make the agreed-upon contributions and transferred all remaining assets to a successor entity named Boston Bakers, Inc. The Fund Manager of the Health Benefits and Insurance Fund (referred to hereinafter as the "Health Fund") thereupon sued Green & Freedman, Boston Bakers and the two corporations' principals, Richard Elman and Stanley Elman, in the district court to recover the payments owed by Green & Freedman with interest, costs and penalties. Both corporate defendants conceded liability for the delinquent contributions owed by Green & Freedman to the Health Fund. The Elmans, however, denied they were personally liable for these corporate debts, and a jury trial took place to determine that issue. After the presentation of evidence, and before submission to the jury, the district court entered judgment as a matter of law in favor of the Elmans, pursuant to Federal Rule of Civil Procedure 50(a). The Health Fund appeals. We affirm in part and reverse in part.  -2- I. Background __________ Defendant-Appellee Green & Freedman Baking Company ("Green & Freedman") was a family-owned Massachusetts corporation formed in 1934 that produced and sold baked goods until, on January 15, 1993, its remaining assets were transferred in bulk to Appellee Boston Bakers, Inc. ("Boston Bakers"). Boston Bakers operated essentially the same business as Green & Freedman until its demise in 1995.  Starting in 1975, responsibility for Green & Freedman's affairs rested with Defendants-Appellees Stanley Elman and Richard Elman, grandsons of one of the company founders. Stanley Elman started working for Green & Freedman in 1959 and by 1969 became its treasurer and a director, positions he occupied through the end of the corporation's and its successor's existence. Richard Elman began with Green & Freedman in 1964 and served as its President and a director from 1975.  Prior to transferring its assets to Boston Bakers as of January 15, 1993, Green & Freedman employed between 12 and 18 truck drivers who were members of the Bakery Drivers and Helpers Local 494. The union drivers' wages, hours, and conditions of employment were governed by a collective bargaining agreement between the Union and Green & Freedman, effective from May 5, 1991 to May 1, 1994. That agreement required Green & Freedman to contribute $88 per week for -3- every covered worker to the New England Teamsters and Baking Industry Health Benefits and Insurance Fund. The Health Fund's contractual right to contribution was additionally protected by 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. 1145 (1985), which doubles the obligation of any employer who promises in a collective bargaining agreement to make contributions to a multiemployer benefits or pension plan. From 1991, Green & Freedman began to suffer what the Elmans described as a serious, and ultimately irreversible, decline in sales and profits. Beginning in April 1992, and continuing until its business was terminated in January 15, 1993, Green & Freedman stopped making its required contributions to the Health Fund. Green & Freedman's unpaid contributions for this period, totaling $39,776, are the basis for the liability the Health Fund seeks to impose in this action. By December 1992, the Elmans had decided to transfer all of Green & Freedman's assets to a newly-formed corporate shell entitled Boston Bakers, Inc., pursuant to the bulk transfer provisions of the Massachusetts Uniform Commercial Code. See Mass. Gen. Laws ch. 106, 6-101 to 6- ___ 110 (1990), repealed, Mass. Acts 1996 ch. 160, 3 (1996).1 ________  ____________________ 1. Although repealed in 1996, the former Massachusetts U.C.C. Article 6 still applies to bulk transfers that, like the Boston Bakers transaction, occurred prior to the repeal. -4- Boston Bakers was simply a continuation of Green & Freedman's business. Its nominal and sole shareholder was Claire Lank, a long-time Green & Freedman employee installed by the Elmans. The Elmans were designated as the new corporation's officers and, along with their wives, as its directors. A voting trust with Lank enabled the Elmans to continue exercising complete control of Green & Freedman's assets, once transferred, in the form of Boston Bakers. The bulk transfer shifted all of Green & Freedman's assets, which were then worth somewhere between $480,000 and $500,000, to Boston Bakers. In exchange, Boston Bakers assumed Green & Freedman's secured debt. The secured debt, which totaled $498,498.17, was owed to two secured creditors: U.S. Trust, the company's institutional lender, and the 75 Old Colony Avenue Realty Trust (the "Realty Trust"), a real estate trust that owned the company's plant for the benefit of the Elmans. U.S. Trust held a security interest in all of Green & Freedman's property, both then-owned and thereafter acquired, while the Realty Trust held a mortgage on the plant.  As part of the bulk transfer, Boston Bakers gave Green & Freedman a promissory note, which Boston Bakers held for the benefit of Green & Freedman's unsecured creditors, worth $32,798.99. That amount left the unsecured creditors,  ____________________ See 1996 Mass. Acts ch. 160, 5. ___ -5- including the Health Fund, with claims worth roughly five cents on the dollar.  As required by law, Green & Freedman, after some hesitation, announced the bulk transfer to creditors in late December 1992 and provided a list of its assets. See Mass. ___ Gen. Laws ch. 106, 6-104 to 6-106, repealed, Mass. Acts ________ 1996 ch. 160, 3. The Health Fund responded by bringing this action in the federal district court which, in its initial form, sought, inter alia, a preliminary injunction _____ ____ against the transfer of Green & Freedman's assets, alleging the transfer to violate ERISA 515, 29 U.S.C. 1145. On January 12, 1993, the district court denied injunctive relief. Three days later, the bulk transfer was consummated. Boston Bakers thereafter carried on business in the same manner as Green & Freedman. Employing the same workers and equipment at the same plant, it produced the same kinds of baked goods for the same customers. Boston Bakers was as unprofitable as Green & Freedman. After two-and-a-half years of continued difficulties, U.S. Trust foreclosed, and Boston Bakers closed its doors in August 1995. According to Richard Elman's testimony, which was not contradicted, the Elmans personally received no distribution in settling the company's affairs.  -6- Following the liquidation of Boston Bakers' assets, the Health Fund filed an amended complaint2 seeking recovery of the delinquent contributions from both corporations, and from Richard Elman and Stanley Elman as well. As Green & Freedman had done previously, Boston Bakers conceded liability for the contributions Green & Freedman failed to make to the Health Fund from April 1992 until the bulk transfer on January 15, 1993. With the assets of both Green & Freedman and Boston Bakers completely liquidated, the Health Fund looked to the Elmans personally for recovery of Green & Freedman's delinquent contributions. Count 3 of the Health Fund's Second Amended Complaint alleged that the Elmans were personally liable as the "'alter egos' of Green and Freedman." Count 4 premised the Elmans' personal liability on their disregard for Boston Bakers' corporate identity, alleging that the Elmans completely controlled  ____________________ 2. An amended complaint dated March 1, 1995, was superseded by a Second Amended Complaint dated July 14, 1995. In both complaints, the Health Fund sought recovery for Green & Freedman's defaulted payments due under the collective bargaining agreement for the period April 1992 through January 15, 1993, totaling $39,770, exclusive of interest, costs and liquidated damages. Recovery from Green & Freedman was sought under the contract, and from Boston Bakers on the theory that, as a successor entity to Green & Freedman, Boston Bakers was obligated to remit the latter's delinquent contributions. Recovery from the two Elmans personally was sought because they were allegedly "alter egos" of Green & Freedman, and because they allegedly established Boston Bakers with fraudulent intent, exercised complete control over it (although owning no stock), and disregarded its corporate identity. -7- Boston Bakers and created it with fraudulent intent. Both parties requested a trial by jury. At trial, the Health Fund called Stanley Elman, Richard Elman, and Richard's wife, Barbara Elman as witnesses. Counsel for the Elmans declined cross-examination at the time, planning to call the Elmans later as their own witnesses. The Health Fund also introduced the deposition testimony of Claire Lank, who had served as Green & Freedman's secretary before being installed as Boston Bakers' nominal shareholder. In addition, the parties stipulated to the admission of many documents recording the collective bargaining agreement, the creation of Boston Bakers, and the operation of Green & Freedman.  At the close of the Health Fund's case-in-chief, the Elmans moved for judgment in their favor as a matter of law pursuant to Rule 50(a). The district court granted the motion with respect to Count 3 and the liability of Green & Freedman, ruling that the Health Fund had failed to meet the criteria stated in Alman v. Danin, 801 F.2d 1 (1st Cir. _____ _____ 1986), for corporate veil-piercing in an ERISA case. The court left open for the time being the Health Fund's claim that the Elmans were personally liable for Boston Bakers' liability.  The defense then called as its only witness Richard Elman, who testified about the creation and operation of -8- Boston Bakers. The Elmans renewed their motion for judgment as a matter of law. Again relying on Alman, the district _____ court allowed the motion.  The Health Fund now appeals from the district court's grant of judgment as a matter of law. II. Standard of Review __________________ To review a grant of judgment as a matter of law, we stand in the district court's shoes and may affirm only if the evidence did not furnish a "legally sufficient basis for a reasonable jury to find" for the non-moving party. Fed. R. Civ. P. 50(a)(1); see also Coyante v. Puerto Rico Ports _________ _______ __________________ Auth., 105 F.3d 17, 21 (1st Cir. 1997). This standard _____ requires more than "a mere scintilla" of evidence in the non- moving party's favor. Fashion House, Inc. v. K Mart Corp., ___________________ ____________ 892 F.2d 1076, 1088 (1st Cir. 1989). Every reasonable inference, however, must be drawn in favor of the non-moving party. See Favorito v. Pannell, 27 F.3d 716, 719 (1st Cir. ___ ________ _______ 1994).  In the instant appeal, we must decide whether there was a legally sufficient basis in the evidence presented for a reasonable jury to have pierced the corporate veils and to have imposed personal liability on the two Elmans for the conceded indebtedness to the Health Fund of both companies. The legal standard for when it is proper to pierce the corporate veil is notably imprecise and fact-intensive. -9- Leading commentators state that "no hard and fast rule as to the conditions under which the [corporate] entity may be disregarded can be stated as they vary according to the circumstances of each case," William M. Fletcher, 1 Fletcher ________ Cyclopedia of the Law of Private Corps. 41.30, at 662 (1990 _______________________________________ rev. ed.), and, more skeptically, that "[t]here is a consensus that the whole area of limited liability, and conversely of piercing the corporate veil, is among the most confusing in corporate law," Frank H. Easterbrook & Daniel R. Fischel, Limited Liability and the Corporation, 52 U. Chi. L. _____________________________________ Rev. 89, 89 (1985).  Because a rigid test could not account for all the factual variety, the federal common law standard adopted in our Circuit for measuring an ERISA plaintiff's veil-piercing claim is somewhat open-ended. We said in Alman that courts _____ should consider "the respect paid by the shareholders themselves to [the] separate corporate identity; the fraudulent intent of the [individual defendants]; and the degree of injustice that would be visited on the litigants by recognizing the corporate identity." Alman, 801 F.2d at 4. _____ Of these three elements, "a finding of some fraudulent intent is a sine qua non to the remedy's availability." See United ___ ______ Elec., Radio and Machine Workers v. 163 Pleasant Street ___________________________________ ____________________ Corp., 960 F.2d 1080, 1093 (1st Cir. 1992).  _____ -10- Before examining the district court's Rule 50(a) ruling in light of these criteria, we need to consider yet another problem. The ERISA cause of action under which the Health Fund sued here, ERISA 515(a)(1)(3), authorizes only injunctive or "other appropriate equitable relief." 29 _________ U.S.C. 1132(a)(1)(3) (emphasis added). Courts have interpreted this cause of action as providing no right to a jury trial, even when the relief sought is monetary. See, ____ e.g., Spinelli v. Gaughan, 12 F.3d 853, 855 (9th Cir. 1993). ____ ________ _______ As a result, Alman and other federal precedent were bench _____ proceedings in which the judge determined both the law and the facts. No consideration was given to the separate responsibilities of judge and jury in the applying of veil- piercing criteria.  The jury trial here, not being of right, was undertaken by the judge with the consent of both parties. Federal Rule of Civil Procedure 39(c), allows a judge to order a consensual jury trial in actions not triable as of right by a jury. In such cases, the "verdict has the same effect as if trial by jury had been a matter of right." Id. ___ Accordingly, in reviewing the district court's Rule 50(a) determination, we are supposed to apply the same principles as if the jury trial had been one of right. We must do so here, however, without the benefit of ERISA precedent instructing on whether, and to what degree, the jury rather -11- than the judge is responsible for applying the Alman veil- _____ piercing factors.  While the absence of ERISA precedent on this aspect is somewhat troubling, we conclude that, in a consensual jury trial, it is principally the jury's function, and not the court's, to decide whether or not the Alman veil-piercing _____ standards were met. The jury, to be sure, can find individual liability only if the evidence is minimally sufficient to do so under Alman criteria. Whether the _____ evidence reaches that threshold is a question of law. But given the issue's fact-intensive nature, the legal threshold of evidentiary sufficiency is a relatively low one. In reaching the above conclusion, we are influenced by the fact that federal courts, outside the ERISA context, have held that veil-piercing "is the sort of determination usually made by a jury because it is so fact specific." Wm. ___ Passalacqua Builders, Inc. v. Resnick Developers S., Inc., ___________________________ ____________________________ 933 F.2d 131, 137 (2d Cir. 1991); see also FMC Finance Corp. ________ _________________ v. Murphree, 632 F.2d 413, 421 & n.5 (5th Cir. 1980) (holding ________ that, as a matter of federal procedure in diversity cases, "the issue of corporate entity disregard is one for the jury"). Most state courts adopt a similar approach. See, ____ e.g., Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc., ____ ____________________________________ ______________ 754 F.2d 10, 14 (1st Cir. 1985)(applying Massachusetts law); Castleberry v. Branscum, 721 S.W.2d 270, 277 (Tex. 1986) ___________ ________ -12- (treating veil-piercing as factual and, therefore, jury question). Courts in these jurisdictions have emphasized that "[t]he conditions under which the corporate entity will be disregarded vary according to the circumstances present in each case." Electric Power Bd. v. St. Joseph Valley ____________________ ___________________ Structural Steel Corp., 691 S.W.2d 522, 526 (Tenn. 1985). _______________________ Even where veil-piercing is decided by judge rather than jury, the courts have held that the question, while equitable, is one of fact. See, e.g., Smetherman v. Wilson, _________ __________ ______ 626 So.2d 71, 73 (La. Ct. App. 1993) (explaining that trial judge decides whether to pierce corporate veil after examining the "totality of the circumstances"). Indeed, in Alman we reviewed the district court's determinations that _____ the individual defendants "had acted in bad faith" and "had not respected [corporation's] separate existence even minimally" as "inferences" subject to the clearly-erroneous review accorded issues of fact. 801 F.2d at 4; see also Pipe ________ ____ Fitters Health and Welfare Trust v. Waldo, R., Inc., 969 F.2d ________________________________ _______________ 718, 721 (8th Cir. 1992) (reviewing ERISA veil-piercing decision for clear error).  In assigning veil-piercing here largely to the jury, we are also influenced by the fact that, although entitled to a bench trial, the parties agreed to proceed before a jury. This choice would be next to meaningless were we now to hold that the principal contested issue -- the -13- Elmans' personal liability -- remained one for the court to determine. Given a Rule 39(c) election to proceed by jury trial, other courts have held that the district court may relegate all factual determinations to the jury, even those normally treated as equitable. See, e.g., Gloria v. Valley __________ ______ ______ Grain Prods., Inc., 72 F.3d 497, 499 (5th Cir. 1996); ____________________ Thompson v. Parkes, 963 F.2d 885, 888 (6th Cir. 1992); cf. ________ ______ ___ McCain Foods, Inc. v. St. Pierre, 463 A.2d 785, 787 (Me. ___________________ ___________ 1983)(holding that veil-piercing, while normally in Maine a matter for the court, was properly submitted to jury under a state rule parallel to Fed. R. Civ. P. 39(c)). The point of Rule 39(c)'s jury-by-consent provision has been said to be to allow parties who so wish to have disputed facts, including ultimate facts, resolved by a jury. See generally 9 Charles _____________ A. Wright & Arthur R. Miller, Federal Practice and Procedure ______________________________ 2333 (1995).  As the veil-piercing determination is principally for the jury to make, we shall affirm the district court's grant of judgment for the individual defendants only, as previously noted, if we determine there was no "legally sufficient basis for a reasonable jury to find" for the plaintiff Health Fund. (Our review standard would obviously be different were veil-piercing regarded as a legal issue relegated to the judge even in a jury trial.) -14- We turn now to the evidence presented below, inquiring whether jury issues were presented concerning the Elmans' personal liability, first, for Green & Freedman's obligations to the Health Fund, and, second for Boston Bakers responsibility for those same obligations. III. Piercing the Corporate Veil: Green & Freedman _____________________________________________ We hold that, on the record before the district court its decision to take from the jury the question of the Elmans' liability for Green & Freedman's delinquent contributions was erroneous and must be vacated. We find ample evidence to afford a reasonable jury, applying the Alman criteria, 801 F.2d at 4, and exercising its broad _____ authority over the veil-piercing issue, supra, a legally _____ sufficient basis to reach beyond Green & Freedman's corporate identity and hold the Elmans liable for the corporation's unpaid contributions.  A. Fraudulent Intent _________________ As previously noted, "the cases that permit veil piercing in the ERISA milieu all emphasize that a finding of some fraudulent intent is a sine qua non to the remedy's availability." United Elec., Radio and Machine Workers, 960 _______________________________________ F.2d at 1093. We explained in that case that, in the ERISA veil-piercing sense, fraud need not reach the level needed for criminal or even independently actionable civil fraud. Still, it has to be more than "invisible." Id.  ___ -15- There was evidence that the Elmans, through their domination of Green & Freedman, caused the corporation to make payments to themselves and their relatives at a time when the corporation was known to be failing and could be expected to default, or was already in default, on its obligations to the Health Fund. These payments could be found to lack any business justification. Courts have routinely viewed the wrongful diversion of corporate assets to or for controlling individuals at a time when the corporation is in financial distress as a fraud that can justify piercing the corporate veil. See, e.g., Laborers' __________ _________ Pension Trust Fund v. Sidney Weinberger Homes, Inc., 872 F.2d __________________ _____________________________ 702, 705 (6th Cir. 1988) (per curiam)(piercing veil where shareholder withdrew corporate funds at time of dissolution); Lowen v. Tower Asset Management, Inc., 829 F.2d 1209, 1221 _____ _____________________________ (2d Cir. 1987) (holding individuals responsible for fiduciary's ERISA violations on evidence of "extensive intermixing of assets . . . among the corporations and individual defendants"); Labadie Coal Co. v. Black, 672 F.2d ________________ _____ 92, 98-99 (D.C. Cir. 1982) (instructing trial court to consider defendants' diversion of corporate assets to personal uses); I.A.M. National Pension Fund v. Wakefield ______________________________ _________ Indus., Inc., 14 Employee Benefits Cas. (BNA) 1890 (D.D.C. _____________ 1991) (piercing employer's corporate veil under ERISA based in part on "selective diversion of corporate assets"); see ___ -16- generally 1 William M. Fletcher, Cyclopedia of the Law of _________ __________________________ Corporations 41.30, at 663 (listing among relevant factors ____________ "siphoning of corporate funds by dominant stockholders" and "the use of corporate funds to pay personal expenses without proper accounting"). The Health Fund introduced a series of checks that the Elmans made out to themselves from Green & Freedman's corporate accounts. These checks dated from January 1991 to January 1993, a period during which, according to Richard Elman, Green & Freedman "was in trouble," "los[ing] some money," and experiencing a "decline in profits and sales." In the last few months of this period, Green & Freedman ceased to be able to pay its debts including its required contributions to the Health Fund. It then transferred its assets to Boston Bakers. Meanwhile, the Elmans had been writing themselves and their relatives checks for no business purpose that the Elmans could adequately explain. When questioned about one of these payments, Richard Elman testified that the corporation was repaying him an unrecorded loan -- itself evidence weighing in favor of piercing the corporate veil, see United States v. Pisani, 646 F.2d 83, 88 (3d Cir. 1981) ___ _____________ ______ (piercing corporate veil on basis of repayment of shareholders' loan at time when corporation was failing) -- -17- before stating that he could not remember the purpose of the payment.  Particularly flagrant was the evidence of a personal vacation that the Elmans financed with corporate funds. In January 1991, the Elmans caused Green & Freedman to pay for them to travel to New Orleans, where they attended the Super Bowl. On direct examination, Stanley Elman testified that the checks in question represented "payment for expenses and conducting business." On cross-examination, however, Stanley Elman admitted that Green & Freedman had no customers in Louisiana and did no business in connection with the Super Bowl. Nothing in Stanley Elman's testimony rehabilitated his initial claim that he conducted business on the Super Bowl trip.  In addition, the Elmans caused Green & Freedman to pay Eleanor Elman, Stanley Elman's wife, three checks for a total of $4,500. Stanley Elman initially explained these payments as wages. However, the Elmans did not report this amount on their tax return and there was no evidence that Green & Freedman reported it as wages. Moreover, Green & Freedman's receptionist, Claire Lank, testified that Eleanor Elman did not work at Green & Freedman during 1992. Finally, just days before Green & Freedman executed the bulk transfer to Boston Bakers, and at a time when the company had ceased to meet its obligations to the Health -18- Fund, the Elmans caused the corporation to write an unexplained check for cash in the amount of $10,000, and a second check payable to Stanley Elman for $2,500.  The payments made by Green & Freedman to the Elmans and their relatives during 1991 and 1992 with no apparent business justification amounted to $30,109. In ruling on the Elmans' Rule 50(a) motion, the district court was required to draw all reasonable inferences and resolve credibility issues in favor of the non-movant Health Fund. Looked at in this light, the evidence was sufficient to support a jury determination that the Elmans had used corporate funds for personal purposes at times when they knew either that the company was inadequately capitalized to meet its obligations, or that, in fact, it had stopped doing so -- and, in particular, had ceased to pay its Health Fund obligations. We add that the jury's ability to conclude that the Elmans had acted in a knowingly fraudulent manner would have been bolstered by inconsistencies in the Elmans' testimony about the payments, particularly their testimony that the Super Bowl trip and Eleanor Elman's "wages" had business purposes. The Elmans protest that the amount of arguable self-dealing evidenced at trial was too little to justify sending the Health Fund's case to the jury. The Elmans point out that the payments described above amounted to less than one percent of the corporation's gross annual sales, and that -19- the trip to New Orleans was, after all, only one trip. While it is difficult to quantify nicely the amount of fraud required, the Elmans's self-dealing occurred on several occasions, at a time when the company was in financial straits. We cannot say that this conduct and the amounts involved were de minimis, to the point that no reasonable jury could find that the fraudulent intent prong of the Alman _____ standard was established. B. Disregard of Corporate Identity _______________________________ The fraudulent self-dealing just discussed was probative not only of fraudulent intent but also of another Alman element, disregard of corporate identity. On the _____ latter score, there was additional evidence. For example, the Elmans appear to have mixed their own finances with those of Green & Freedman's. At a time that the Elmans owed the corporation $141,000 in loans, they also loaned it $170,000 through their real estate trust. These unexplained dealings suggest that money was being moved around with little or no regard for the corporate identity. There was no record of the terms of the purported loans nor of any agreement to repay. Undocumented and interest-free loans could be found to show a disregard for the corporate form. See, e.g., __________ Uriarte, 736 F.2d at 524 (treating unrecorded and interest- _______ free loans from shareholders to the corporation as evidence of shareholders' disrespect for corporate form).  -20- Beyond the undocumented loans, there was evidence of inadequate and, indeed, fraudulent record keeping. The Elmans admittedly falsified Green & Freedman's minutes to state that their wives, who served as nominal directors, attended and authorized corporate borrowing, when in fact their wives did neither.  We accept the Elmans' contention that a closely- held corporation need not hew to every corporate formality in order to maintain its shareholders' immunity from the corporation's debts. A veil-piercing plaintiff will not prevail if the evidence shows only that the closely-held defendant corporation was run without the strict formalities of its publicly-held counterpart. But the evidence adduced at trial, viewed most favorably to the Health Fund, could be found to show practices that went beyond mere informalities. Important transactions between the corporation and its controlling shareholders went undefined, and the Elmans appear to have created false minutes. These facts, when added to the financial self-dealing and when viewed in a light most favorable to the Health Fund, support a reasonable inference by a jury that the Elmans, in the two years before Green & Freedman's demise, did not treat Green & Freedman as a separate entity.  C. Manifest Injustice __________________ -21- The evidence just described under the first two Alman factors could also allow a reasonable jury to conclude _____ that sheltering the Elmans from Green & Freedman's liability to the Health Fund would be manifestly unjust. As one commentator has explained, courts have found this prong met when "a corporation is so undercapitalized that it is unable to meet debts that may reasonably be expected to arise in the normal course of business." Note, Piercing the Corporate Law __________________________ Veil: The Alter Ego Doctrine Under Federal Common Law, 95 _________________________________________________________ Harv. L. Rev. 853, 855 (1982). Thus, a jury would not be unreasonable in viewing as manifestly unjust the Elmans' decision to issue themselves payments for personal, non- corporate purposes, as well as other unexplained payments, at a time when the corporation could not meet its obligations to the Health Fund. Of course, the mere non-payment of debt is not, by itself, enough to justify piercing the corporate veil. However, a jury could reasonably conclude on the basis of the evidence below that the Elmans both placed their personal interests ahead of their corporation's responsibilities and did not themselves honor Green & Freedman's corporate form. As a result, it could be thought manifestly unjust to insist that the Health Fund be restricted by the corporate form. IV. Piercing the Corporate Veil: Boston Bakers ___________________________________________ -22- Whether the evidence sufficed for a jury to find the Elmans personally liable for Boston Bakers' successorship obligation to pay Green & Freedman's indebtedness for Health Fund contributions missed in April 1992, through January 1993, is more problematic. Given the Elmans' potential direct liability, supra, for Green & Freedman's debts on this _____ score, the question of their tangential exposure for the same debt via Boston Bakers may seem more theoretical than real. Still, the court's ruling on count 4 of the complaint raises the issue, and we must address it. For the showing of fraud needed to pierce Boston Bakers' corporate veil, the Health Fund relies inter alia upon the Elmans' transfer of Green & Freedman's assets to Boston Bakers, a transaction said to be inherently fraudulent. Yet we can see nothing in the transfer itself that further disadvantaged the Health Fund in its ability to realize its claim for Green & Freedman's unpaid contributions. Had the Elmans chosen simply to shut down the operations of Green & Freedman in early 1993, instead of undertaking the bulk transfer to Boston Bakers, a jury would have to conclude that the Health Fund would have received nothing. At the time of the bulk transfer, it was undisputed that Green & Freedman had no more than $2,000 in cash on hand, and liabilities to secured creditors that _______ outweighed its assets. The firm's primary secured creditor, -23- U.S. Trust, held a security interest in all of Green & Freedman's assets. Once a debtor grants an all-assets security interest, unsecured creditors like the Health Fund are made no worse off by a bulk transfer: the transferred assets were already encumbered and therefore unavailable to the Health Fund regardless of the bulk transfer. We note that neither in its second amended complaint nor in arguments on appeal, has the Health Fund claimed that Boston Bakers, as Green & Freedman's successor, was liable under the latter's collective bargaining contract for payments after January 15, 1993, the date Green & _____ Freedman shut down. Rather the damages sought are for the period from April 1992, until January 15, 1993, being all based on defaulted contributions owed by Green & Freedman while it was still operating. Boston Bakers' liability is premised solely on its inherited responsibility for these earlier debts of its predecessor. As said, had Green & Freedman simply shut down on January 15, 1993, the Health Fund would apparently have been no better off. (It might, arguably, have been worse off.) Plaintiff propounds no concrete theory as to how the bulk transfer further diminished its prospects for recovering the sums owed by Green & Freedman between April 1992 and January 15, 1993. It is significant that, from the outset, Boston Bakers continued openly to carry on the business of Green & -24- Freedman. Lank, Boston Bakers' nominal shareholder and receptionist, even continued to answer the phone "Green and Freedman" after the bulk sale. A company does not extinguish its ERISA obligations simply by changing the name on its letterhead. See Hawaii Carpenters Trust Funds v. Waiola ___ _______________________________ ______ Carpenter Shop, Inc., 823 F.2d 289, 294 (9th Cir. 1987) ______________________ (holding that alter ego test is met when two corporations share a "substantial continuity"); cf. Guzman v. MRM/ELGIN, ___ ______ _________ 409 Mass. 563, 566 (1991) (explaining exception to general rule of successor non-liability for a transferee that "is merely a continuation of the seller corporation"). Thus, Boston Bakers was available throughout its existence to answer for the liabilities of its predecessor. At trial, the Health Fund produced no evidence as to how the bulk transfer worked to its disadvantage. As Richard Elman's uncontradicted testimony put it, by December 1992, Green & Freedman was in such dire straits that it had to choose between liquidation and reorganization. The Elmans chose the latter course, and undertook a reorganization through the bulk transfer.  Further undercutting the contention that the mere fact of the bulk transfer demonstrates the Elmans' fraudulent intent is the fact that they did not conceal the transfer. As required by statute, Green & Freedman notified its creditors, including the Health Fund, before executing the -25- bulk transfer. The district court thereafter denied the Health Fund's motion to enjoin the transfer, an action from which no appeal was taken. We are thus unable to find, on this record, that the bulk transfer provided the Elmans with an unfair advantage, amounting to a fraud, material to the Health Fund's current claim. Under Alman, fraudulent intent is a _____ necessary element in order to piece the corporate veil. We do not think a jury could properly derive a relevant finding of fraudulent intent material to the harm alleged from the transfer by itself. See United Elec., Radio and Machine ___ _________________________________ Workers, 960 F.2d at 1094 (approving "good faith if _______ ultimately unsuccessful attempt to resurrect a moribund company"); Laborers Clean-Up Contract Admin. Trust Fund v. _______________________________________________ Uriarte Clean-Up Serv., Inc., 736 F.2d 516, 525 (9th Cir. _____________________________ 1984) (noting difference between a corporation that was unable to pay its debts from the outset and one that simply "fell upon bad times").  Besides the fact of the bulk transfer, the Health Fund points to other factors as a supposed basis for piercing Boston Bakers' veil. In its complaint it alleged that the nominal and sole shareholder, Claire Lank, was "unaware" of her obligations and rights as a shareholder and, instead of following her independent judgment, followed the Elmans' instructions. Also alleged was the Elmans' complete control -26- over Boston Bakers, even though they owned no stock; the Elmans' disregard of corporate identity; and the incorporation of Boston Bakers with fraudulent intent. These allegations, however, to the extent legally material, must stand or fall on the existence in the record of some supporting evidence. Moreover, proof of corporate informalities, standing alone, are insufficient. Plaintiff may not prevail without some evidence of fraudulent intent material to the harm suffered.  _____________________________ There is no evidence of financial self-dealing in the case of Boston Bakers such as occurred with Green & Freedman. None of the checks introduced by the Health Fund as payable to or for the Elmans came from Boston Bakers' accounts. In respect to the claimed "undercapitalization" of Boston Bakers, all the latter's capital came from the bulk transfer; there was no unmet agreement by the Elmans to add more, nor evidence that, after transfer to Boston Bakers, they diverted the bulk transfer funds to personal objectives. The mere fact that Boston Bakers eventually failed or had less capital than needed is not a basis for reaching the Elmans personally, absent fraud. Much is made of the fact that Richard Elman indicated ignorance as to how he was named president and -27- director of Boston Bakers3 or whether Boston Bakers held an annual shareholders' meeting. Stanley Elman failed to recognize the firm's stock ledger. And Lank, the sole shareholder, appears to have been a straw for the Elmans, allegedly so as to make it harder for creditors to reach them personally. None of these items, however, singly or together, provide a sufficient evidentiary basis to pierce the corporate veil. While they may suggest a lack of attention to corporate formalities, they do not reflect fraudulent intent material to the harm alleged, nor is it clear how any of them, even slightly, disadvantaged the plaintiff. There was also evidence that the Elmans' wives did not know they were directors; did not participate in board meetings, although corporate records falsely indicated they did; and did not know that Lank was the sole stockholder. But these snippets do little to demonstrate more than corporate informality. Even if the false corporate records concerning the wives' attendance at directors' meetings are characterized as a "fraud," there is no evidence the Health Fund knew or relied on this information to its detriment or  ____________________ 3. Q: And would you acknowledge, sir, that you don't know by what authority you were elected a director of Boston Bakers? A: The attorneys set up the corporation. I don't know the direction. I know I was an officer, the president. -28- sustained any injury whatever as a result. The "fraudulent intent of the individual defendants" mentioned in Alman _____ requires some meaningful relationship between the intent and the harm visited upon plaintiff. We add that even the Health Fund itself does not argue that the incorrect records by themselves show fraudulent intent sufficient under Alman. _____ We conclude that the district court was correct in granting the Elmans' motion for judgment as a matter of law with respect to the Elmans' alleged personal liability for Boston Bakers' corporate obligation to make good Green & Freedman's delinquent payments to the Health Fund. V. Conclusion __________ The district court's grant of judgment as a matter of law is vacated with respect to Count 3 and affirmed with vacated affirmed _______ respect to Count 4. The case is remanded for a new trial and other proceedings consistent herewith. -29-