# United States Court of Appeals
## For the First Circuit

No. 09-1784

MIGUEL NÚÑEZ COLÓN, et al.,

Plaintiffs-Appellants,

v.

HONORABLE PEDRO TOLEDO-DÁVILA, et al.,

Defendants-Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Marcos E. López, U.S. Magistrate Judge]

Before

Torruella, Leval,* and Thompson, Circuit Judges.

Jane Becker Whitaker was on brief for appellants.
Susana I. Peñagarícano-Brown, Assistant Solicitor General, Department of Justice, with whom Irene S. Soroeta-Kodesh, Solicitor General, Leticia Casalduc-Rabell, Deputy Solicitor General, and Zaira Z. Girón-Anadón, Deputy Solicitor General, were on brief for appellees.

May 26, 2011

*Of the Second Circuit, sitting by designation.

**THOMPSON, <u>Circuit Judge</u>.** Police officer Miguel Núñez Colón ("Núñez") was arrested and fired from the Puerto Rico police department after he misappropriated $600 during the search of a home. Núñez claims multiple constitutional violations in connection with this incident. The lower court disagreed, and discerning no error we AFFIRM.

## FACTS

### The Misappropriation

On July 21, 2005, Núñez, a twelve-year veteran of the police force, went with other officers to a residence in response to an informant's tip. The tip concerned the possibility that drugs and weapons were being stored at the home. A group of officers searched the residence without a warrant, though it is disputed whether Núñez actually entered the home. What is known is that a woman named Wanda Serrano was found sleeping inside and that she had $600 in small bills stored in a plastic bag. Ms. Serrano's money somehow found its way to Núñez, though another bone of contention is whether Núñez was given the money by another officer or whether he found it himself. In either event, within hours, Núñez contacted his supervisor, told him that he had the $600, and asked him what to do. He was advised to return the money to Ms. Serrano and to obtain a receipt from her, which Núñez did the next day.

Though the money was back in the hands of its rightful owner,

-2-

the police department initiated an investigation of the incident. Further, a criminal complaint for illegal appropriation was filed against Núñez, and the Puerto Rico Court of First Instance found probable cause for his arrest. On December 3, 2005, things only got worse for Núñez when defendant Police Superintendent Pedro Toledo-Dávila ("Toledo") summarily suspended him without pay. On December 15th, Núñez requested an administrative hearing.

## The Administrative Proceedings

Six months after it was requested, Núñez's post-suspension hearing began on June 1, 2006. Significant for purposes of this appeal is the fact that Núñez was acquitted of the criminal charges fourteen days prior to the start of the hearing. At the hearing, Núñez was represented by counsel who questioned witnesses. But alas this effort was to no avail. Núñez was found to have violated police department regulations, a sanctionable offense. The police department, through a letter penned by Toledo, terminated Núñez on October 26, 2006.

Núñez appealed the administrative decision to the Investigation, Processing and Appeals Commission (Spanish acronym "CIPA"). CIPA also ruled against Núñez, finding that he in fact violated department regulations when he took the $600, which was not connected to any illegal activity and therefore should not have been seized. CIPA also noted that Núñez's acquittal did not affect the ability of the police department to fire him.

Undeterred Núñez sought further review. He appealed CIPA's decision to the Puerto Rico Court of Appeals ("PRCA"). Applying an abuse of discretion standard, the PRCA affirmed CIPA. Núñez chose not to petition the Puerto Rico Supreme Court to review the PRCA's decision. Despite this fact, his quest for a remedy was not yet complete.

### The Federal Court Proceedings

Ever persistent, Núñez embarked on a contemporaneous journey through the federal judiciary. Núñez's sojourn began in October 2006 when he filed a complaint with the United States District Court for the District of Puerto Rico. Núñez (with his wife and children as co-plaintiffs) sued the Puerto Rico police department, the Puerto Rico Department of Justice, superintendent Toledo, and other involved police department employees pursuant to 42 U.S.C. § 1983. He alleged: (1) wrongful arrest in violation of the Fourth Amendment; (2) malicious prosecution also contrary to the Fourth Amendment; (3) retaliation for conduct protected by the First Amendment; and (4) Fourteenth Amendment due process violations. Núñez also invoked supplemental jurisdiction over state-law defamation and malicious prosecution claims.

Over the course of the next two years plus, the district court ruled on various motions resulting in two written decisions. In its first, the court dismissed Núñez's retaliation claim based on the doctrine of collateral estoppel and his wrongful termination

-4-

allegation because due process requirements were met. Núñez Colón v. Toledo Dávila, 2009 WL 1108821 (D.P.R. Apr. 23, 2009). In its second decision, the court dismissed Núñez's wrongful arrest and malicious prosecution claims because he could not establish the requisite elements - in part because collateral estoppel barred Núñez from re-litigating certain issues. Núñez Colón v. Toledo Dávila, 2009 WL 1311008 (D.P.R. Apr. 27, 2009). The court also dismissed Núñez's state law defamation claim on supplemental jurisdiction grounds as there was no common nucleus of fact between it and the lone remaining federal claim. The court then went on to dismiss the claims of the wife and children plaintiffs for lack of standing, and the claims against all defendants but Toledo because he was the only one Núñez alleged directly violated his rights.

With just Núñez and Toledo left standing, the case proceeded to a jury trial. The only remaining issue was whether Núñez's due process rights were violated during his post-suspension administrative proceeding. After Núñez presented his case, Toledo made a Rule 50(a) motion for judgment as a matter of law. The district court ruled in Toledo's favor and issued a bench ruling dismissing Núñez's final claim. The court first dismissed Núñez's official capacity claim against Toledo. It held that because recovery under this claim was limited to injunctive relief (e.g. ordering the suspension to end), there was no feasible relief for Núñez because he no longer worked for the police department. The

court then addressed Núñez's claim against Toledo in his personal capacity. With respect to this claim, the court found that there was not legally sufficient evidence on which a jury could find in Núñez's favor. His appeal to this court followed. In it, Núñez claims that the district court blundered when it applied collateral estoppel, excluded certain testimony, and ruled against him on the due process claim.

## DISCUSSION

## Collateral Estoppel

In its first written decision, the district court applied the doctrine of collateral estoppel to bar Núñez's argument that he did not misappropriate the $600 and that his dismissal from the police department was unwarranted. The court found that Núñez had already litigated these issues in his post-suspension administrative proceeding - the result of which was affirmed by CIPA and the PRCA. The court also held that a Puerto Rico state law[1] exception to collateral estoppel (discussed at length below) did not apply. With the precluded issues out of play, the court reasoned that Núñez could not prove his retaliation, wrongful arrest, and malicious prosecution claims and therefore dismissed them. We review this dismissal de novo, taking as true the well-pleaded

---

[1] Though Puerto Rico enjoys unique commonwealth status, it is the "functional equivalent of a state for purposes of full faith and credit" and therefore we sometimes refer to its courts as "state courts" and its law as "state law." Cruz v. Melecio, 204 F.3d 14, 19 n.2 (1st Cir. 2000).

facts in the complaint and drawing all reasonable inferences in favor of Núñez.  See Isla Nena Air Servs., Inc. v. Cessna Aircraft Co., 449 F.3d 85, 87 (1st Cir. 2006).

On appeal, Núñez does not dispute that the elements of collateral estoppel have been satisfied, and therefore we need not tarry long on the doctrine's requirements.  It suffices to note that collateral estoppel bars re-litigation of any issues that were, or could have been, brought in a previous action for which judgement was rendered.  See Barreto-Rosa v. Varona-Mendaz, 470 F.3d 42, 45 (1st Cir. 2006).

What Núñez does argue is that an exception to collateral estoppel should apply.  The particular exception is a Puerto Rico state law doctrine that has been referred to by this court as the "public policy exception."[2]  Medina v. Chase Manhattan Bank, 737 F.2d 140, 144 (1st Cir. 1984).  The exception is premised on the idea that in certain circumstances public policy will demand an exception to collateral estoppel.[3]  See Barreto-Rosa, 470 F.3d at 48.  More specifically, Puerto Rico courts have declined to apply

---

[2] We look to Puerto Rico case law because we must apply state law when deciding the res judicata effect of a state court judgment in federal court.  Cruz, 204 F.3d at 18.

[3] Much of the case law addressing the public policy exception speaks in terms of res judicata.  The relevant Puerto Rico statute, P.R. Laws Ann. tit. 31, § 3343, applies to both res judicata and collateral estoppel and therefore we use the terms interchangeably. See Puerto Ricans for P.R. Party v. Dalmau, 544 F.3d 58, 69 (1st Cir. 2008).

collateral estoppel when doing so would defeat the "ends of justice, especially if reasons of public policy are involved." Bonafont Solís v. Am. Eagle, Exec. Airline, Inc., 1997 P.R. Eng. 423,416 (1997) (internal quotation marks and citation omitted).

Regrettably, the Puerto Rico jurisprudence available in English translation that addresses the public policy exception does not articulate a clear standard as to when the exception applies. The case law is also ambiguous as to the exception's requirements. In particular, the courts sometimes use the terms "public interest" and "public policy" interchangeably. See Bonafont Solís, 1997 P.R.-Eng. 423,416 (1997); Pagán Hernández v. U.P.R., 7 P.R. Offic. Trans. 795 (1978). We do not believe these terms are synonymous and treating them so creates ambiguities. Further, in Pagán Hernández v. U.P.R. (a case Núñez cited heavily) the Puerto Rico Supreme Court concluded that the pubic policy exception applied but never articulated what public policy (or interest) was at play. Pagán Hernández, 7 P.R. Offic. Trans. 795 (1978). This seems to us an important piece of information to omit.

Nor do we derive much specific guidance from this court's decisions. Although this court has plunged into the murky waters of the public policy exception a handful of times, it has not set forth a clear rule regarding when to apply the exception. See Medina, 737 F.2d at 145 (noting that the "boundaries of the 'public policy' exception . . . are not precisely defined"). Instead this

-8-

court's analysis has centered around a factual comparison between the case before it and the Puerto Rico public policy exception cases - with a focus on the fairness of the process rendered to the plaintiff in the first instance or whether an overriding public policy was at stake. See, e.g., Barreto-Rosa, 470 F.3d at 48; Medina, 737 F.2d at 144. This seems a wise course and so we follow.

The public policy exception has been applied by the Puerto Rico courts in a variety of cases. This includes actions where the potentially preclusive prior judgment (1) affected the rights of a minor, (2) was moot, or (3) involved a dismissal for lack of prosecution. See Bonafont Solís, 1997 P.R.-Eng. 423,416 (1997) (providing an account of cases where the public policy exception has been applied). However, most germane to this appeal is the aforementioned case of Pagán Hernández v. U.P.R., 7 P.R. Offic. Trans. 795 (1978). In Pagán, the court found that the doctrine of res judicata should be more flexible, as the possibly preclusive judgment stemmed from a tainted administrative proceeding. Because Núñez hung his hat almost exclusively on Pagán, we compare the facts of the two cases.

Pagán involved a student who was expelled from the University of Puerto Rico after his alleged participation in criminal activities. The student, Pagán, sought readmission when the criminal charges were dropped, but the university refused. Pagán

sued, and one of the issues before the Puerto Rico Supreme Court was whether it was barred by the doctrine of res judicata from addressing the suspension because the university's disciplinary board had already decided the issue. The court found that it was not barred because the public policy exception applied. In reaching this conclusion, the court found the following circumstances significant.

First, Pagán was a young student who was invoking his constitutional right to education.[4] Second, he was being deprived of this right based on evidence the Puerto Rico Supreme Court had deemed inadequate in a separate proceeding. That is, the evidence the administrative body relied on when suspending Pagán was found in Pagán's criminal proceeding to be "insufficient, suggestive, and unreliable." Pagán, 7 P.R. Offic. Trans. 795 (1978). Furthermore, the Puerto Rico Superior Court had previously found that Pagán's administrative proceeding was afflicted with "institutional confusion" and that its conclusiveness was "dubious." Id. As for what public policy was at issue, the court, as noted above, did not answer this question and rather seemed to rely on a general "furtherance of justice" principle. Id. With these facts in mind, we turn to the case at hand.

As with Pagán, the decision which stands in the way of Núñez

---

[4] Article II, section 5 of the Puerto Rico Constitution provides for a right to education.

litigating certain issues is an administrative one. Also, like the plaintiff in Pagán, Núñez claims that his constitutional rights were violated by defendant Toledo. But as stated in Pagán, the "mere invocation of a constitutional right against an administrative act is not a key which would automatically move us to reject the presumption of res judicata." Id. Rather this court must "inquire into the circumstances present in each particular case." Id. And so we do.

In the matter at hand - unlike in Pagán - there is no inkling that Núñez's administrative hearing or the resulting decision was questionable or problematic. In particular, while the Pagán administrative decision was criticized by the lower court, Núñez's was upheld by both CIPA and the PRCA. Also dissimilar to Pagán is the fact that there is no credible indication that the evidence against Núñez at the administrative level was unreliable. For although Núñez proclaims the existence of a malicious conspiracy, this is not supported by the record. By Núñez's own admission, the sworn testimony of several officers placed him in the apartment and even in Serrano's bedroom. Furthermore, one officer testified that he saw Núñez take the money and another officer told investigators the same thing. Even Núñez himself admits that he was in temporary possession of the money, in violation of police department regulations. This contrasts starkly with Pagán, where the only evidence against the plaintiff was the testimony of a lone officer

(deemed unreliable) and a photographic identification (found untrustworthy).

Finally, we find it significant that Núñez made the choice to file an administrative action prior to initiating the federal proceedings. Furthermore, Núñez (who was represented by counsel at all levels) chose to end his administrative/state court journey by not appealing the PRCA decision to the Puerto Rico Supreme Court. We do not think public policy requires us to give Núñez a chance to revisit those choices. See Baez-Cruz v. Municipality of Comerio, 140 F.3d 24, 30 (1st Cir. 1998) (finding that public policy does not counsel in favor of allowing plaintiffs to revisit their decision to initiate an administrative action first). In fact, as we have said before, "public policy also includes an interest in finality and efficiency." Medina, 737 F.2d at 144 (internal quotation marks omitted). So although we acknowledge that Núñez suffered a significant blow when he lost his job, he had a fair and full opportunity to litigate such issues at the administrative and state court level.

The public policy exception is inapplicable, and therefore the doctrine of collateral estoppel barred Núñez from arguing that he did not misappropriate the money and that he should not have been fired. With these issues off the table, Núñez had no hope of proving his retaliation, wrongful arrest, and malicious prosecution claims. Notably, Núñez does not contend otherwise. We affirm the

-12-

district court's dismissal of Núñez's claims.

## Excluded Testimony

During trial and outside the presence of the jury, Núñez's counsel made an offer of proof as to the testimony of various police officers she planned to call as witnesses. Núñez wanted to introduce the officers' testimony to show that the police department's allegations against him were weak and malicious and that therefore he should not have been suspended. The district court excluded the testimony because it only pertained to whether Núñez appropriated the money - an issue that was barred from being addressed by collateral estoppel. Núñez claims error.[5] We review the district court's evidentiary ruling for abuse of discretion, affording the court considerable deference. See United States v. Gonzalez-Melendez, 594 F.3d 28 (1st Cir. 2010); United States v. Wallace, 461 F.3d 15, 28 (1st Cir. 2006).

Our independent review of the testimony reveals that it indeed pertains to the evening that Ms. Serrano's money was stolen. Here are the particulars: Núñez sought to introduce testimony about the informant's tip, what officers were wearing that night, the layout

---

[5] Núñez relies on Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 543 (1985), for the proposition that a fired employee should be given "some opportunity . . . to present his side of the case." This reliance is incorrect. The Supreme Court was speaking in terms of an employee presenting evidence as to the appropriateness of his discharge, an issue that was no longer in play at Núñez's trial. At this point, only due process questions about the adequacy of Núñez's administrative proceeding remained.

-13-

of the apartment, what happened during the search, what the officers saw Núñez do with the money, and the criminal investigation against him. This testimony is problematic because it only relates to whether or not Núñez took the money, an issue that was already off limits. The testimony has nothing to do with the narrow trial issue of whether Núñez's due process rights were violated in connection with his post-suspension administrative hearing. A "district court has broad discretion to make relevancy determinations," and we would be hard pressed to find an abuse of that discretion here. Richards v. Relentless, Inc., 341 F.3d 35, 49 (1st Cir. 2003). Because the district court did not abuse its discretion in excluding the testimony, we affirm.

## Due Process Claim

At trial only Núñez's due process claim remained, but even this would not see a jury. The court dismissed Núñez's official capacity claim against Toledo because there was no possible remedy. Finding insufficient evidence, the court also granted judgment as a matter of law in Toledo's favor on Núñez's personal capacity claim. Specifically, the court found that (1) police department regulations permitted Toledo to summarily suspend Núñez without a hearing, (2) any time delays were not unconstitutional, and (3) Toledo was not personally involved in the alleged due process violations. On appeal, Núñez only takes issue with the latter two

findings.[6]  Because we find that the time delay did not violate Núñez's due process rights, we need not reach the issue of Toledo's personal involvement.

We review the district court's grant of judgment as a matter of law de novo, and standing in the district court's shoes we affirm if "a reasonable jury would not have a legally sufficient evidentiary basis to find" for the non-moving party.  Fed. R. Civ. P. 50(a)(1); see also Crane v. Green & Freedman Baking Co., 134 F.3d 17, 21 (1st Cir. 1997).  "This standard requires more than 'a mere scintilla' of evidence in the non-moving party's favor." Crane, 134 F.3d at 21 (citing Fashion House, Inc. v. Kmart Corp., 892 F.2d 1076, 1088 (1st Cir. 1989)).

Núñez's due process argument is simple - it took too long for his post-suspension hearing to take place.  To be precise, Núñez takes issue with the fourteen-day lag between his acquittal and the start of the hearing.[7]  To establish a due process violation, Núñez must "show first, a deprivation of a protected property interest, and second, a denial of due process."  Perez-Acevedo v. Rivero-

_____

[6] Núñez does not claim that the district court erred by dismissing Toledo in his official capacity.

[7] In his reply brief, Núñez for the first time advances another argument - that the six months between the start of his suspension and the start of the hearing also violated his due process rights.  Because Núñez failed to raise this argument earlier, it is waived and we will not address it.  See United States v. Capozzi, 486 F.3d 711, 719 n.2 (1st Cir. 2007) ("We have consistently held that arguments not raised in the initial appellate legal brief are considered waived.").

-15-

<u>Cubano</u>, 520 F.3d 26, 30 (1st Cir. 2008). Only his ability to make the second showing is contested and therefore we move on to the question of whether Núñez received the process he was due.

The fatal flaw in Núñez's argument is its absence of substance. He does no more than assert that the fourteen-day period was too long to wait. The Supreme Court has previously found such an argument deficient. <u>See</u> <u>Cleveland Bd. of Educ.</u> v. <u>Loudermill</u>, 470 U.S. 532, 543 (1985). In <u>Loudermill</u>, the plaintiff waited nine months to receive a final decision on a post-termination adjudication. Like Núñez, the plaintiff in <u>Loudermill</u> relied on the time delay alone to support his position that a speedy resolution was missing. The Supreme Court criticized this approach, finding that the plaintiff "offered no indication that his wait was unreasonably prolonged" other than the amount of time it took. <u>Id.</u> at 547. The Court went on to hold that the "chronology of the proceedings set out in the complaint, coupled with the assertion that nine months is too long to wait, does not state a claim of constitutional deprivation." <u>Id.</u> Núñez's conclusory and generalized claim suffers from the same infirmity because he does not articulate why the fourteen days was an unreasonably lengthy period. Under <u>Loudermill</u>, he has thus failed to state a constitutional deprivation claim. Accordingly defendant Toledo was entitled to judgment as a matter of law.

Though our inquiry can end there, we will briefly touch on why

-16-

we do not find the fourteen-day period unconstitutional based on the limited argument before us. In order to do so, we look to the factors set out by the Supreme Court in <u>Gilbert</u> v. <u>Homar</u>, 520 U.S. 924, 930 (1997), a case also dealing with the process due to a suspended employee.[8] The relevant factors to be balanced in a due process inquiry are:

> "'[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest.'"

<u>Id.</u> at 931-32 (quoting <u>Mathews</u> v. <u>Eldridge</u>, 424 U.S. 319, 335 (1976)).

Regarding the first factor, there seem to be two private interests at stake for Núñez: his interests in being reinstated to his position and in being paid. We do not dispute that the deprivation of one's livelihood is significant but, as noted in <u>Gilbert</u>, we must consider the length and finality of the deprivation. <u>Id.</u> at 932. The period Núñez takes issue with was only fourteen days, and during that time he was faced with a

---

[8] In <u>Gilbert</u>, the Supreme Court ultimately did not answer the question of whether the employee received a sufficiently prompt post-suspension hearing because the issue was not addressed by the lower courts. The Court remanded the question to the Third Circuit Court of Appeals, which remanded it to the district court, which concluded that the sixteen-day period the plaintiff waited for his post-suspension hearing was not unconstitutional. <u>See</u> <u>Homar</u> v. <u>Gilbert</u>, 63 F. Supp. 2d 559, 570 (M.D. Pa. 1999).

temporary suspension as opposed to termination (a factor that was significant in Gilbert). Id. at 932. Further, though undoubtedly important to Núñez, his income was reduced for a temporary and short duration. This first factor does not bode in Núñez's favor.

As for the second factor of erroneous deprivation, we don't think it favors Núñez either. Núñez was acquitted on May 17, 2006 and his hearing began on June 1, 2006. It was in Núñez's interest for the department to take some amount of time to consider how the positive development of Núñez's acquittal might affect his suspension. This delay actually benefitted Núñez, who possessed "'an interest in seeing that a decision concerning his . . . continued suspension [was] not made with excessive haste.'" Id. at 935 (quoting FDIC v. Mallen, 486 U.S. 230, 243 (1988)).

With respect to the final factor - the government's stake - the Court in Gilbert made it clear that the government has a significant interest in suspending police officers when they are accused of a felony. Id. at 932. However, as was the case with Núñez, "[o]nce the charges [are] dropped, the risk of erroneous deprivation increase[s] substantially." Id. at 935. Nonetheless, Núñez's acquittal did not eliminate the police department's interest in the controversy. The department needed to determine whether Núñez (who had been accused of theft on the job in violation of police department regulations) should continue to be suspended in light of his acquittal. We do not think it

-18-

unreasonable that the police department took fourteen days to make this determination.  This is especially true because as a police officer, Núñez occupied a position "of great public trust and high visibility."  Id. at 932.

Balancing the Gilbert factors, we find that the fourteen-day period was not unreasonably long and more importantly was not unconstitutional.  For the foregoing reasons, we affirm the grant of judgment as a matter of law in Toledo's favor.

## CONCLUSION

Accordingly, we AFFIRM the decision of the district court.